**Nos. 24-1876, 24-1885**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

ORANGE ELECTRONIC CO. LTD,

*Plaintiff-Appellant*,

v.

AUTEL INTELLIGENT TECHNOLOGY CORP., LTD.,

*Defendant-Cross-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Texas, No. 2:21-cv-00240-JRG

# CORRECTED PRINCIPAL AND RESPONSE BRIEF OF DEFENDANT-CROSS-APPELLANT

Hao Tan
Shen Wang
ARCH & LAKE LLP
203 N. LaSalle Street, Suite 2100
Chicago, IL 60601
(312) 558-1369

Nicole A. Saharsky
Gary M. Hnath
James A. Fussell, III
Bryan C. Nese
Minh Nguyen-Dang
Clark S. Bakewell
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3052
nsaharsky@mayerbrown.com

**U.S. Patent No. 8,031,064 C3 – Claim 26**

A tire pressure detecting system, comprising:

an identification rewritable tire pressure detector used for being installed in a vehicle, the identification rewritable tire pressure detector comprising:

a micro-processing module having a rewritable memory unit to record an identification;

a sensing module electrically connected to the microprocessor module and having a pressure-detecting unit to detect a tire pressure and send a detection result to the micro-processing module;

a transmitting module controlled by the micro-processing module to transmit a radio frequency (RF) signal, wherein the RF signal comprises the detection result and the identification of the identification rewritable tire pressure detector;

a power module electronically connected to the micro-processing module to supply power to the identification rewriteable tire pressure detector; and

an interface arranged to receive an external signal and send the external signal to the micro-processing module, wherein the external signal comprises an external identification to be written into the rewriteable memory unit or to be used to overwrite a preset identification in the rewriteable memory unit; and

a portable setting apparatus arranged to communicate with the identification rewriteable tire pressure detector, comprising:

a control module;

an input module connected to the control module to enable an operator to manually input an identification to be written into the identification rewriteable tire pressure detector;

a receiving module connected to the control module to receive the RF signal from the identification rewriteable tire pressure detector or a tire pressure detector and to send the RF signal to the control module;

a setting output module controlled by the control module to send the external signal to the interface of the identification rewriteable tire pressure detector, wherein the external signal is generated by the control module and comprises the identification that is provided by the input module or provided by the RF signal received from the receiving module; and

a power source connected to the control module to supply power to the setting apparatus;

wherein the portable setting apparatus is not equipped in the vehicle and is portable relative to the vehicle, and is configured to:

obtain an update identification to be written into a new identification rewriteable tire pressure detector either by (1) receiving the RF signal from an old tire pressure detector by the receiving module, retrieving an old identification of the old tire pressure detector from the RF signal, and using the old identification as the update identification, or by (2) receiving a manual input of the identification from the input module, and using the identification as the update identification, wherein the old tire pressure detector stores only the old identification;

store the update identification in the setting apparatus; and

generate the external signal comprising the update identification as the external identification, and send the external signal to the new identification rewriteable tire pressure detector such that the new identification rewriteable tire pressure detector records the update identification in the rewritable memory unit or overwrites the preset identification in the rewritable memory unit by the update identification, wherein the external identification is from the old tire pressure detector, and the external signal is a low frequency (LF) signal.

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1876, 24-1885

**Short Case Caption** Orange Electronic Co. Ltd. v. Autel Intelligent Technology Corp., Ltd.

**Filing Party/Entity** Autel Intelligent Technology Corp., Ltd.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/09/2024

Signature: /s/ Nicole A. Saharsky

Name: Nicole A. Saharsky

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Autel Intelligent Technology Corp., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gregory Bays, Leydig, Voit & Mayer, Ltd. | Pei Chen, Leydig, Voit & Mayer, Ltd. | Geoffrey Patton Culbertson, Patton Tidwell & Culbertson, LLP |
| Christopher J. Fahy, Arch & Lake LLP | Fan Liang, Arch & Lake LLP | Peter J. Curtin, Arch & Lake LLP |
| Jonathan D. Stahl, Mayer Brown LLP | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page


INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 4

STATEMENT OF THE ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. Factual Background ........ 5

1. Tire Pressure Monitoring Systems ........ 5

2. Prior Art TPMSs ........ 6

3. The ’064 Patent ........ 6

4. Autel And The Accused Products ........ 10

B. Procedural Background ........ 11

1. Pre-Trial Proceedings ........ 12

2. Trial ........ 13

3. Post-Trial Proceedings ........ 17

SUMMARY OF THE ARGUMENT ........ 18

ARGUMENT ........ 22

I. THE ASSERTED CLAIMS ARE NOT PATENT ELIGIBLE ........ 23

*Standard of Review* ........ 23

A. The Asserted Claims Are Drawn To An Abstract Idea ........ 23

B. The Asserted Claims Lack An Inventive Concept ........ 27

1. The Claimed Systems Use Generic And Well-Known Components In A Conventional Way ........ 27

2. There Is No Evidence Of Inventiveness ........ 32

II. THE ASSERTED CLAIMS ARE OBVIOUS ........ 36

*Standard of Review* ........ 36

A. Nihei And Nantz Disclose Every Limitation Of The Asserted Claims ........ 36

B. Orange’s Remaining Arguments Fail ........ 47

**TABLE OF CONTENTS**
**(continued)**

**Page**

III. AUTEL DID NOT DIRECTLY INFRINGE THE ASSERTED CLAIMS ....... 52

*Standard of Review* ....... 52

A. Autel Did Not Sell, Offer To Sell, Or Import The Accused Products In The United States ....... 53

1. Autel Did Not Sell The Accused Products In The United States ....... 53

a. The unrebutted evidence showed that Autel did not sell the accused products in the United States ....... 54

b. Orange's arguments lack merit ....... 61

2. Autel Did Not Offer To Sell The Accused Products In The United States ....... 68

3. Autel Did Not Import The Accused Products Into The United States ....... 71

B. The Accused Products Do Not Meet All The Limitations Of The Asserted Claims ....... 72

CONCLUSION ....... 78

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ABT Sys., LLC v. Emerson Elec. Co.*,
797 F.3d 1350 (Fed. Cir. 2015) ....................49, 51

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .................... *passim*

*Allergan, Inc. v. Sandoz, Inc.*,
726 F.3d 1286 (Fed. Cir. 2013) ....................37

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) ....................45

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ....................77

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ....................23

*Boston Sci. Scimed, Inc. v. Cordis Corp.*,
554 F.3d 982 (Fed. Cir. 2009) ....................36

*In re Brandt*,
886 F.3d 1171 (Fed. Cir. 2018) ....................47, 49

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ....................35

*Cardinal Chem. Co. v. Morton Int'l, Inc.*,
508 U.S. 83 (1993) ....................22

*Celgene Corp. v. Mylan Pharms. Inc.*,
17 F.4th 1111 (Fed. Cir. 2021) ....................57

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
935 F.3d 1341 (Fed. Cir. 2019) ....................30, 35

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ....................25, 27

## TABLE OF AUTHORITIES
## (continued)

**Cases (continued)** **Page(s)**

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) ....................30

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
986 F.3d 1367 (Fed. Cir. 2021) ....................33, 34

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
424 F.3d 1168 (Fed. Cir. 2005) ....................33

*Finjan LLC v. Sonicwall, Inc.*,
84 F.4th 963 (Fed. Cir. 2023)....................76

*In re Fulton*,
391 F.3d 1195 (Fed. Cir. 2004) ....................47, 49

*In re Greenstein*,
778 F. App'x 935 (Fed. Cir. 2019)....................26

*In re Gurley*,
27 F.3d 551 (Fed. Cir. 1994) ....................48

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
831 F.3d 1369 (Fed. Cir. 2016) ....................*passim*

*Heelen v. Dep't of Com.*,
154 F.3d 1306 (Fed. Cir. 1998) ....................46

*In re Huai-Hung Kao*,
639 F.3d 1057 (Fed. Cir. 2011) ....................49

*Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*,
336 F.3d 1308 (Fed. Cir. 2003) ....................22

*Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*,
869 F.3d 1336 (Fed. Cir. 2017) ....................37

**TABLE OF AUTHORITIES**
**(continued)**

**Cases (continued)** **Page(s)**

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343 (Fed. Cir. 2015) ....................24

*Junker v. Med. Components, Inc.*,
25 F.4th 1027 (Fed. Cir. 2022)....................59

*Koninklijke Philips N.V. v. Zoll Med. Corp.*,
656 F. App'x 504 (Fed. Cir. 2016)....................46

*Litecubes, LLC v. N. Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) ....................61, 62, 63

*LKQ Corp. v. GM Glob. Tech. Operations LLC*,
102 F.4th 1280 (Fed. Cir. 2024)....................37

*Mack v. Newton*,
737 F.2d 1343 (5th Cir. 1984)....................68

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) ....................23

*Meiresonne v. Google, Inc.*,
849 F.3d 1379 (Fed. Cir. 2017) ....................48, 49

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
420 F.3d 1369 (Fed. Cir. 2005) ....................*passim*

*Metso Minerals, Inc. v. Powerscreen Int'l Distrib., Ltd.*
526 F. App'x 988 (Fed. Cir. 2013)....................51

*Microsoft Corp. v. AT&T Corp.*,
550 U.S. 437 (2007) ....................53, 65

*Move, Inc. v. Real Est. All. Ltd.*,
721 F. App'x 950 (Fed. Cir. 2018)....................33, 34

*Network-1 Techs., Inc. v. Hewlett-Packard Co.*,
981 F.3d 1015 (Fed. Cir. 2020) ....................52

## TABLE OF AUTHORITIES (continued)

**Cases (continued)** **Page(s)**

*North Am. Philips Corp. v. American Vending Sales, Inc.*,
35 F.3d 1576 (Fed. Cir. 1994) ....................64

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021)....................25

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
2021 WL 981123 (S.D. Cal. Mar. 16, 2021)....................71

*Pulse Elecs., Inc. v. U.D. Elec. Corp.*,
2022 WL 1436146 (Fed. Cir. May 6, 2022) ....................71

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1370 (Fed. Cir. 2010) ....................61, 62, 63

*Secured Mail Sol. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ....................24

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.*,
873 F.3d 1364 (Fed. Cir. 2017) ....................26

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
581 U.S. 258 (2017) ....................12

*TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*,
375 F.3d 1126 (Fed. Cir. 2004) ....................23, 36, 73

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ....................28, 30

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
617 F.3d 1296 (Fed. Cir. 2010) ....................68, 70

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
699 F.3d 1340 (Fed. Cir. 2012) ....................50, 70

## TABLE OF AUTHORITIES
## (continued)

**Cases (continued)** **Page(s)**

*Traxcell Techs., LLC v. Sprint Commc'ns Co.*,
15 F.4th 1121 (Fed. Cir. 2021)....................................................................76

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023)....................................................................30

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ..................................................................32

*TypeRight Keyboard Corp. v. Microsoft Corp.*,
374 F.3d 1151 (Fed. Cir. 2004) ..................................................................23

*United States v. Jackson*,
27 F.4th 1088 (5th Cir. 2022)......................................................................73

**Statutes and Rules**

28 U.S.C. § 1295(a)(1) ....................................................................................4

28 U.S.C. § 1331 ..............................................................................................4

28 U.S.C. § 1338 ..............................................................................................4

Patent Act, 35 U.S.C. § 100 *et seq.* ................................................................71

35 U.S.C. § 101.......................................................................................*passim*

35 U.S.C. § 103..................................................................................................4

35 U.S.C. § 271(a) ..............................................................................*passim*

49 C.F.R. § 571.138 ............................................................................................5

## TABLE OF AUTHORITIES
## (continued)

**Other Authorities** **Page(s)**

*Black's Law Dictionary*

(11th ed. 2019) ....................................................................................59

(12th ed. 2024) ....................................................................................71

U.S. Patent Application Pub. No. 2006/0208864.................................*passim*

U.S. Patent Application Pub. No. 2007/0055411.................................*passim*

## STATEMENT OF RELATED CASES

No other appeal from *Orange Electronic Co. Ltd v. Autel Intelligent Technology Corp., Ltd.*, No. 2:21-cv-00240-JRG (E.D. Tex.) was previously before this Court or any other court of appeals.

There are no cases that could directly affect or be directly affected by the Court's decision in this case.

## INTRODUCTION

Orange Electronic Co. Ltd (Orange) alleged that Autel Intelligent Technology Corp., Ltd. (Autel) directly infringed two claims of U.S. Patent No. 8,031,064 C3 (the ’064 patent). Autel argued that the asserted claims are invalid. A jury concluded that the claims are valid and that Autel directly infringed the claims. On post-trial motions, the district court upheld the jury’s verdict as to validity but granted judgment as a matter of law to Autel as to infringement, concluding that there was no evidence that Autel sold, offered to sell, or imported the accused products in the United States.

This Court should reverse the district court’s judgment as to validity. The asserted claims are drawn to patent-ineligible subject matter and are obvious in light of the prior art. Further, the Court should affirm the district court’s judgment of non-infringement, either on the basis that Autel did not sell, offer to sell, or import the accused products in the United States, or on the alternative basis that the accused products do not practice each limitation of the asserted claims.

Autel is a Chinese company that manufactures tire pressure monitoring tools and detectors in China and sells them to a subsidiary, Autel U.S. Inc. (Autel U.S.), in China. The asserted claims cover systems for replacing tire pressure detectors in vehicles – systems that were widespread before

Orange filed for this patent. The claimed advance in the asserted claims is cloning the identifier of the old detector into the new detector.

The district court concluded that the asserted claims are directed at an abstract idea, but that there was a factual dispute as to whether the claims contain an inventive concept. The evidence at trial conclusively demonstrates that they do not. The only evidence Orange presented on this point was conclusory expert testimony that is indistinguishable from testimony that this Court has held cannot establish validity as a matter of law.

The evidence at trial also established that the claims are obvious. At trial, Orange's technical expert identified only two limitations in the claims that, in his view, were not taught by the prior art – the limitations that the device used to clone the identifier of the detector is portable, and that the device can receive a manual input of the identifier to be cloned. But he admitted on cross-examination that one of the prior art references teaches both limitations. For this reason also, the Court should hold that the asserted claims are invalid.

Further, the Court should affirm the district court's judgment of noninfringement. The unrebutted evidence demonstrated that Autel did not sell, offer to sell, or import the accused products in the United States, and thus did not directly infringe the asserted claims – Orange's only remaining

claim against Autel. The evidence showed that Autel sold and delivered the accused products to Autel U.S. in China, pursuant to agreements formed in China. The evidence also showed that Autel was not involved in importing the accused products into the United States – instead, it was solely non-party Autel U.S.'s responsibility to ship those products out of China. Although Orange challenges the district court's judgment of non-infringement, it does not point to any evidence showing that Autel sold, offered to sell, or imported the accused products in the United States.

The Court also could affirm the district court's judgment of non-infringement for the independent reason that the accused products do not practice the asserted claims. The asserted claims describe a system in which the tire pressure detectors store only *one* identifier – a limitation Orange added to avoid prior art systems in which the detectors store more than one identifier. Yet the undisputed evidence showed that the detectors in Autel's systems store three separate identifiers. Autel's systems thus do not meet that critical limitation of the asserted claims.

For these reasons, the Court should reverse the district court's judgment that the asserted claims are valid and should affirm the district court's judgment of non-infringement.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338. It entered final judgment on May 3, 2024. Appx57.

Orange timely filed a notice of appeal on May 22, 2024. No. 24-1876, Dkt. 1. Autel timely filed a notice of cross-appeal on May 23, 2024. No. 24-1885, Dkt. 1. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the asserted claims are invalid under 35 U.S.C. § 101 because they are not drawn to patent-eligible subject matter.

2. Whether the asserted claims are invalid under 35 U.S.C. § 103 because they are obvious.

3. Whether there was no substantial evidence that Autel directly infringed the asserted claims because:

    a. Autel did not sell, offer to sell, or import the accused products in the United States, as required under 35 U.S.C. § 271(a), and/or

    b. Autel does not practice the limitation in the asserted claims that the old tire pressure detector stores only one identification, because Autel's detectors store more than one identification.

## STATEMENT OF THE CASE

### A. Factual Background

The following facts are drawn from the ’064 patent and the unrebutted evidence at trial.

#### 1. Tire Pressure Monitoring Systems

The ’064 patent is directed to a “tire pressure monitoring system” (TPMS). Appx117. TPMSs monitor the air pressure inside individual tires on vehicles and alert the driver when a tire is outside of the desired pressure range. Appx117. The systems claimed in the ’064 patent allow users to replace tire pressure detectors without needing to reprogram the vehicle’s onboard computer with the identifier of the new detectors. Appx117.

In 2008, when Orange filed its application for the ’064 patent, TPMSs for monitoring air pressure inside vehicles’ tires were widely commercially available. Vehicles had TPMSs as early as 1999. Appx2581. Starting in 2007, federal law required manufacturers to equip all passenger vehicles in the United States with a TPMS that warns drivers if any of the tires on the vehicle are underinflated. Appx2581; *see* 49 C.F.R. § 571.138. As a result, TPMSs were widespread in 2008 and today are ubiquitous.

### 2. Prior Art TPMSs

According to the ’064 patent, prior art TPMSs could be inconvenient to reprogram when a pressure detector needed to be replaced. Prior art TPMSs typically included a pressure detector in each tire and an onboard computer in the vehicle that received wireless signals from the detectors. Appx117. Each detector included a unique identifier in its wireless signals, so that the onboard computer could identify which signal was sent by which detector. Appx117. But those detectors sometimes failed and had to be replaced. Appx117.

In prior art systems, when a detector was replaced, the vehicle’s onboard computer needed to be reprogrammed with the unique identifier of the replacement detector. Appx117. That was accomplished by using a setting apparatus to write the identifier of the new detector to the onboard computer. Appx117. In order to do that, the ’064 patent explains, the vehicle owner had to seek out a service provider that had a setting apparatus that was compatible with the owner’s TPMS, which the ’064 patent asserts was inconvenient. Appx117.

### 3. The ’064 Patent

On September 17, 2008, Orange filed the application that resulted in the ’064 patent. Appx117. Orange is a Taiwanese company that makes

TPMS setting apparatuses and tire pressure detectors. Appx84, 87. The ’064 patent underwent three reexaminations; the asserted claims (claims 26 and 27) are set forth in Ex Parte Reexamination Certificate No. 11,679 to the ’064 patent, which issued on May 15, 2020. Appx126-129.

The ’064 patent describes the problem of needing hardware that is compatible with a user’s TPMS. It discloses a system in which the user can give a new tire pressure detector the identifier of the old detector. Appx117. That way, the user can simply replace the old detector with the new detector, without needing to update the vehicle’s onboard computer.

The asserted claims implement the alleged invention by claiming “a tire pressure detecting system” that is comprised of an “identification rewritable tire pressure detector” and “a portable setting apparatus.” Appx128-129.

The first key component – the “identification rewritable tire pressure detector” – is the new tire pressure detector that receives the identifier of the old detector. It comprises “a micro-processing module” that has rewritable memory; “a sensing module” that detects tire pressure and sends the results to the micro-processing module; “a transmitting module” that transmits a radio frequency signal that contains the pressure detection results and the identifier of the tire pressure detector; an “interface” that receives

an external signal that contains the identifier of the old detector and sends that signal to the micro-processing module; and a "power module" that powers the tire pressure detector. Appx128-129.

The second key component – the "portable setting apparatus" – is the device that updates the identifier of the new tire pressure detector. It is configured to "obtain" the "update identification" (*i.e.*, the identifier of the old detector) that will be "written into" the new detector. Appx128-129. It is comprised of an "input module" (such as a keyboard), a "receiving module," a "setting output module," and a "power source." Appx128-129. The claims explain that the setting apparatus is "not equipped in the vehicle" and is "portable relative to the vehicle" – *i.e.*, that it is not part of the vehicle and can be brought to and from the vehicle as needed. Appx128-129.

A schematic of both components is depicted in Figure 1 of the '064 patent. The tire pressure detector (labeled 10) is on the left, and the portable setting apparatus (labeled 20) is on the right:




Appx125.

The portable setting apparatus updates the identifier of the new tire pressure detector in three steps. First, the setting apparatus receives the identifier of the old detector, either by "receiving" a radio frequency signal from the old detector that contains the old detector's identifier or by "receiving" a "manual input" of that identifier from the "input module" (*e.g.*, the user types in the identifier). Appx128-129. Second, the setting apparatus uses that identifier as "the update identification" and stores the update identification in its memory. Appx128-129. Third, the setting apparatus generates a signal to the new detector that contains the update identification. Appx128-129. The new detector then records and rewrites the update identification to its memory. Appx128-129.

In order to distinguish the asserted claims from the prior art, the claims specify that "the old tire pressure detector stores *only* the old identification." Appx128-129 (emphasis added). In other words, the old tire pressure detector contains only one identifier. Orange added this limitation during reexamination to overcome an obviousness rejection based on a reference that discloses a detector that stores multiple identifiers. Appx1795, 8930.

#### 4. Autel And The Accused Products

Autel is a leading manufacturer of TPMS setting tools and tire pressure detectors. *See* Appx2822, 3033-3035. It is a Chinese company and has its principal place of business in Shenzhen, China. Appx3046.

The accused products are a variety of tools and tire pressure monitoring detectors manufactured and sold by Autel that form a TPMS. Appx3034; *see* Appx7451-7453.[1] Autel's tire pressure detectors can be updated with the identifier of old detectors, and its tools can update the iden-

[1] They are the MaxiTPMS TS501, MaxiTPMS TS601, TS401, TS408, TS508, TS608, MS906TS, ITS 600, and TS508WF tools, and the 1-Sensor (Press-in) M, 1-Sensor (Press-in) R, 1-Sensor (Screw-in) M, 1-Sensor (Screw-in) R, 315MHz MX-Sensor M, 433MHz MX- Sensor M, 315MHz MX-Sensor R, and 433MHz MX-Sensor R sensors. Appx9176-9177.

tifier of detectors. Appx2661-2663. Thus, if a user's tires have Autel pressure monitoring detectors and those detectors need to be replaced, the user can purchase new Autel detectors. Appx2661-2663. When the new Autel detectors are installed in the users' tires, Autel's tools can copy the identifiers associated with the old Autel detectors and write those identifiers to the memory of the newly-installed Autel detectors. Appx2661-2663.

Autel does not sell the accused products in the United States. Appx3034. Instead, it sells the products to a subsidiary – Autel U.S. – in China. Appx3034-3035. Autel sells the accused products to Autel U.S. pursuant to an exclusive distribution agreement and sales contracts with Autel U.S. Appx3034-3038; *see* Appx7241-7267 (distribution agreement); Appx9054 (example sales contract). Those agreements were executed in China, and Autel transfers title to the products to Autel U.S. in China. Appx3044-3046, 9054. Autel U.S. then imports the products and sells them in the United States. Appx3036.

### B. Procedural Background

Orange sued only Autel – and not Autel U.S. – for infringement of the '064 patent. Appx83-110. Suing only Autel allowed Orange to bring this suit in the Eastern District of Texas; if it had also sued Autel U.S., Orange would have needed to bring this suit in the Eastern District of New York,

where Autel U.S. is headquartered. Appx567; *see TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 262 (2017).

Over the course of the proceedings in the district court, Orange narrowed its case to assert only direct, literal infringement of claims 26 and 27. Appx2370. Autel filed a counterclaim, alleging that the asserted claims are invalid. Appx607.

### 1. Pre-Trial Proceedings

At the *Markman* stage, the district court construed certain terms in the asserted claims. *See* Appx1. Relevant here, the district court adopted the parties' agreed-upon construction of the term "identification," which is the identifier of the old detector. Appx1 n.1. That agreed construction defined "identification" to mean "a number or code used to identify." Appx1788.

Autel moved for summary judgment on invalidity and non-infringement grounds. As to invalidity, Autel argued that the asserted claims are directed to an abstract idea and lack an inventive concept and thus are patent ineligible under 35 U.S.C. § 101, as interpreted in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014). Appx2376-2377. The district court agreed with Autel that the asserted claims are directed to an abstract idea,

but concluded that a jury should decide the factual disputes about whether the asserted claims lacked an inventive concept. Appx2376-2377.

As to non-infringement, Autel argued that because the undisputed facts showed that the accused Autel detectors store more than one old "identification," they do not practice the claim limitation that requires that "the old tire pressure detector stores *only the old identification*." Appx129 (emphasis added); *see* Appx1564. The district court denied Autel's motion, concluding that disputes of fact, including about whether Autel detectors "store more than old identification," precluded summary judgment. Appx2377.

#### 2. Trial

The district court held a four-day jury trial on Orange's direct infringement claim. Appx2389-3323. Ten witnesses testified, including four experts. Appx2389-3323.

The undisputed evidence showed that the asserted claims are invalid because they claim ineligible subject matter. The district court already had held that the claims "are directed to an abstract concept." Appx2376. Autel showed that the asserted claims do not contain an inventive concept because the claims involve nothing more than performance of well-understood, routine, and conventional activities previously known to the industry. *See, e.g.*,

Appx2606-2608, 2613-2614, 2917-2958, 3157-3167. Orange's technical expert, Joseph McAlexander, conceded that "each of the identified independent components that are required by the" asserted claims "may be available in a toolbox [of] the person with skill in the art," Appx3157, and that conventional techniques and components at the time of the alleged invention included all the teachings of the asserted claims, Appx3160-3167. That conclusion was corroborated by the testimony of the inventor of the '064 patent, Appx2608-2610, and Orange's own products that predated the '064 patent, Appx2613-2614.

The undisputed evidence further showed that the asserted claims are obvious. Autel demonstrated that the asserted claims are obvious based on the combination of U.S. Patent Application Publication No. 2007/0055411 (Nihei), Appx3747-3758, and U.S. Patent Application Publication No. 2006/0208864 (Nantz), Appx3739-3746. Autel's technical expert, Dr. Shukri Souri, testified that each limitation of the asserted claims is disclosed by the combination of Nihei and Nantz. Appx2855-2949. Orange's expert McAlexander identified only two claim limitations that in his view were not disclosed by the combination of Nantz and Nihei – the limitations that the setting apparatus be "portable" and capable of receiving a "manual input." Appx3154-3155. But on cross-examination, he admitted that the setting

apparatus disclosed in Nihei "can move independently" from a vehicle – in other words, that it is "portable relative to the vehicle," as recited in the claims – and that it can be a laptop, which obviously can receive a manual input. Appx3167-3168.

The undisputed evidence also established that Autel did not directly infringe the asserted claims for two reasons. *E.g.*, Appx2823-2827, 2972-2981, 3036, 3039, 3044, 9054.

First, Autel never sold, offered to sell, or imported the accused products in the United States. The only evidence at trial on this issue was testimony from an Autel witness and written contracts between Autel and Autel U.S. *E.g.*, Appx3036, 3039, 3044, 9054. Orange did not present any evidence of its own.

The unrebutted evidence showed that all relevant Autel conduct occurred outside the United States. Specifically, the evidence showed that Autel manufactures the accused products in China after it receives an order from Autel U.S. Appx3036, 3039. Then, once the accused products are manufactured, Autel delivers them to Autel U.S. at different ports in China, at which point title of the accused products passes to Autel U.S. Appx3044. These sales are made pursuant to sales contracts between Autel and Autel

U.S. that are issued in Shenzhen, China, and are made "FOB net Shenzhen," meaning that title and liability for the products passed from Autel to Autel U.S. in Shenzhen. Appx9054 (capitalization altered). There was no evidence that Autel engaged in any part of these transactions in the United States.

Second, the accused products do not meet the claims' requirement that "the old tire pressure detector stores only the old identification." Unrebutted evidence showed that the accused Autel sensors store three "identifications," rather than only one identifier. *E.g.*, Appx2823-2827, 2972-2981.

At the conclusion of evidence, Autel moved for judgment as a matter of law, arguing that the record lacked substantial evidence to support a verdict of infringement or validity. *See* Appx23. The district court denied Autel's motion without prejudice to filing a renewed motion following the verdict. Appx23-24.

The jury returned a verdict in favor of Orange. It concluded that Orange proved that Autel directly infringed the asserted claims of the '064 patent and that the infringement was willful. Appx2383-2386. It also concluded that Autel failed to prove that the asserted claims involve "only technology that was well-understood, routine, and conventional at the time of

the alleged invention," or that the asserted claims are invalid as obvious. Appx2384-2385. It awarded Orange $6,616,397 in damages. Appx2387.

### 3. Post-Trial Proceedings

Autel renewed its motion for judgment as a matter of law, arguing that the evidence established that the asserted claims are invalid and that Autel did not infringe the asserted claims. Appx3386-3436.

The district court denied Autel's motion as to invalidity, reasoning that McAlexander's testimony was adequate for the jury to find that the asserted claims were patent eligible and not obvious. Appx44-56.

The district court granted Autel's motion as to non-infringement. It explained that there was no substantial evidence showing that Autel sold the accused products in the United States, offered to sell the accused products in the United States, or imported the accused products into the United States. Appx22-43. Instead, the court explained, all of the evidence showed that Autel's sales activities occurred in China. Appx22-43. The court did not reach Autel's alternative argument that the record lacked substantial evidence that the accused products met the limitation that "the old tire pressure detector stores only the old identification." *See* Appx26.

## SUMMARY OF THE ARGUMENT

The undisputed evidence demonstrates that the asserted claims are invalid. Further, Orange failed to prove that Autel directly infringed the asserted claims.

I. The Court should reverse the district court's judgment that the asserted claims are patent eligible under 35 U.S.C. § 101.

A. The asserted claims are drawn to patent-ineligible subject matter. Under *Alice* step one, the district court correctly recognized that the claims are directed at updating identification information in the context of a rewritable tire pressure detector, which is an abstract idea because it involves nothing more than data storage, writing, and transmission.

B. Under *Alice* step two, there was no substantial evidence to support the jury's conclusion that the asserted claims contain an inventive concept. The claimed system implements the abstract idea using generic computer components in a conventional way. The only evidence that Orange introduced on this issue was the conclusory testimony of its expert, McAlexander. This Court repeatedly has held that that sort of testimony is insufficient to support a finding that a claim contains an inventive concept.

II. In the alternative, the Court should reverse the district court's judgment that the asserted claims are not obvious.

A. Two prior art references, Nihei and Nantz, disclose each limitation of the asserted claims. In the district court, Orange identified only two limitations in the asserted claims that it argued Nantz and Nihei did not disclose: the limitations that the setting apparatus be "portable" and have the ability to receive manual input. But Orange's expert, McAlexander, conceded on cross-examination that Nihei disclosed those limitations.

B. Orange also argued that Nantz taught away from the alleged invention. But the unrebutted evidence showed that Nantz did not criticize, discredit, or otherwise discourage the alleged invention, and thus did not teach away. Orange further argued that evidence of secondary considerations (two awards that Orange received for its products) supported the jury's verdict. But Orange presented no evidence that those awards had anything to do with the alleged invention described in the '064 patent.

III. The Court should affirm the district court's judgment of non-infringement because there is no substantial evidence of direct infringement, for two independent reasons.

A. First, there is no substantial evidence that Autel sold, offered to sell, or imported the accused products in the United States. To establish direct infringement under 35 U.S.C. § 271(a), Orange had to prove that Autel sold, offered to sell, or imported the accused products in the United

States. The unrebutted evidence shows that Autel is a Chinese company that sold the accused products to Autel U.S. in China.

This Court has explained that a defendant sells a product in the United States when its "substantial activities" relating to the sale occur in the United States. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 831 F.3d 1369, 1378 (Fed. Cir. 2016). Here, Autel manufactured the accused products in China and sold the accused products to Autel U.S. under agreements that were formed in China. Title of the accused products passed to Autel U.S. in China. Autel's contractual obligations to Autel U.S. were fully performed and satisfied in China. All of Autel's substantial activities relating to its sale of the accused products to Autel U.S. thus occurred in China. Orange put on no contrary evidence at trial.

Orange argues that Autel delivered the accused products to the United States and that Autel U.S. signed the distribution agreement in the United States. Those arguments have no support in the record. The unrebutted evidence demonstrates that Autel delivered the accused products to Autel U.S. in China. Further, the distribution agreement states that it became final only after Autel signed it in China – so the agreement was formed in China regardless of where Autel U.S. signed it. Orange also argues that Autel knew that the accused products would eventually end up in the

United States. But such knowledge or intent of a foreign company, without more, is legally insufficient to support a finding that the foreign company sold accused products in the United States.

The unrebutted evidence also showed that Autel did not offer to sell the accused products in the United States. This Court has explained that the location of a defendant's "offer to sell" is the location where the defendant is expected to perform its obligations under the proposed sales contract. The unrebutted evidence demonstrates that Autel's contracts with Autel U.S. all specified that Autel would perform outside the United States, by delivering the accused products to Autel U.S. in China.

Further, the unrebutted evidence showed that Autel did not import the accused products into the United States. Instead, the contracts between Autel and Autel U.S. said that once Autel passed title of the accused products to Autel U.S. in China, it was Autel U.S.'s sole responsibility to arrange and pay for the shipment of the accused products to locations outside of China.

B. Second, the accused products do not meet a key limitation of the asserted claims. The claimed system specifies that when a tire pressure detector is being replaced, the "old tire pressure detector" that is being replaced "stores only the old identification." Under the parties' agreed-upon

construction, the term "identification" means "a number or code used to identify." Orange added this limitation to avoid prior art systems in which the detector stored more than one identifier.

The unrebutted evidence demonstrates that Autel's detectors store three unique identifiers, each of which is a number or code used to identify that detector. Autel's detectors thus contain three "identification[s]" within the meaning of the asserted claims, and not "only the old identification" as required by the claims. Autel's products thus do not meet this claim limitation.

## ARGUMENT

The issue in Orange's appeal is whether Autel directly infringed the asserted claims. The issues in Autel's cross-appeal are whether the asserted claims are invalid because they are not patent eligible or because they are obvious. When an appeal involves both a plaintiff's claim of infringement and a defendant's counterclaim of invalidity, the Supreme Court has held that the Court should address invalidity in light of the "importance to the public at large of resolving questions of patent validity." *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100-03 (1993); *see Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1317 (Fed. Cir. 2003) (under *Cardinal Chemical*, this Court "must" address

validity even if the Court concludes the claims are not infringed). Further, this Court should address invalidity first, because a determination of invalidity "eliminates, as a practical matter, the need to consider" infringement. *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1157 (Fed. Cir. 2004) (internal quotation marks omitted).

## I. THE ASSERTED CLAIMS ARE NOT PATENT ELIGIBLE

The asserted claims are invalid because they are drawn to patent-ineligible subject matter under the two-step test set out in *Alice*. *See* 35 U.S.C. § 101.

*Standard of Review*

Patent eligibility under 35 U.S.C. § 101 "is ultimately an issue of law [the Court] review[s] de novo." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). The Court reviews any embedded factual determinations for substantial evidence. *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1133 (Fed. Cir. 2004).

### A. The Asserted Claims Are Drawn To An Abstract Idea

The Supreme Court has held that "[l]aws of nature, natural phenomena, and abstract ideas" are not eligible for patent protection because "they are the basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012) (internal quotation

marks omitted). Allowing a person to "monopoliz[e]" those "building blocks of human ingenuity" would "impede innovation" and "thwart[] the primary object of the patent laws." *Alice*, 573 U.S. at 216 (internal quotation marks omitted).

In *Alice*, the Supreme Court set out a two-step framework to determine whether a patent claims an abstract idea. At step one, the court asks "whether the claims at issue are directed to" an abstract idea. 573 U.S. at 217. Claims are directed to an abstract idea if they are "directed to a result or effect that itself is the abstract idea," as opposed to "focus[ing] on a specific means or method" of producing that result or effect. *Secured Mail Sol. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 909 (Fed. Cir. 2017) (internal quotation marks omitted). The claims are "considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).

The district court correctly determined that the asserted claims are drawn to an abstract idea. Appx2376-2377. The asserted claims merely describe the idea of cloning the identifier of an old tire pressure detector into a new detector, using generic electronic processes and equipment. Each

asserted claim describes, in generic terms, a system comprised of a "rewritable tire pressure detector," Appx128, and a "portable setting apparatus," Appx128. The claims then state that the portable setting apparatus is configured to receive and store the identifier to be cloned from the old tire pressure detector, Appx128, and then wirelessly transmit that identifier to the new tire pressure detector, Appx128-129, which receives and stores the cloned identifier, Appx129.

The asserted claims merely describe generic ways of implementing the abstract idea, without providing specifics. The claims use generic terms such as "module" and "apparatus" without elaboration, and assert that the apparatus is "configured" to implement the idea of cloning identifiers without describing any specific method of doing so. Appx128-129. In other words, the claims describe only basic steps of data storage, writing, reception, and transmission – all of which this Court repeatedly has recognized are abstract ideas. *See, e.g.*, *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (claimed invention directed to assigning "unique identifier[s]" to data items based on the items' content in order to "communicate information about" the items is directed to an abstract idea); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claimed invention aimed at extracting data

from hard copy documents by "collecting," "recognizing," and "storing" that data is directed an abstract idea).

The asserted claims are indistinguishable from other generic data-manipulation claims that this Court has held are directed to abstract ideas. For example, the Court has held that claims that concerned acquiring identification data and using that data for verification purposes in the context of paying fares for mass transit services were directed at an abstract idea because they merely described "collection, storage, and recognition of data." *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1372 (Fed. Cir. 2017). The Court likewise has concluded that claims that related to providing purchase recommendations on the internet were directed to an abstract idea because they merely described "receiv[ing], manipulat[ing], and transmit[ting] data." *In re Greenstein*, 778 F. App'x 935, 938 (Fed. Cir. 2019).

The claims here are just like those claims – they claim nothing more than the idea of obtaining and rewriting identification information in the context of a TPMS. They therefore are directed to an abstract idea.

### B. The Asserted Claims Lack An Inventive Concept

At *Alice* step two, courts search for an "inventive concept" – *i.e.*, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." 573 U.S. at 217-18 (internal quotation marks omitted). To contain an inventive concept, a claim must require more than "well-understood, routine, and conventional activities previously known to the industry." *Content Extraction*, 776 F.3d at 1347-48 (internal quotation marks omitted). Using generic technology (such as "modules" and "interfaces") is not inventive. *Alice*, 573 U.S. at 225. And the abstract idea itself cannot provide the inventive concept – there must be "something more" in the claims. *Id.* at 217 (internal quotation marks omitted).

The district court held that there were "fact questions present which preclude summary judgment" at step two. Appx2376-2377. The jury then found that the asserted claims did not involve technology that "was well-understood, routine, and conventional at the time of the alleged invention." Appx2385. That finding lacked substantial evidence.

#### 1. The Claimed Systems Use Generic And Well-Known Components In A Conventional Way

The claimed system implements the abstract idea of cloning sensor identifiers by using "generic computer components" that both individually

and together are insufficient "to add an inventive concept to an otherwise abstract idea." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016).

The claimed "identification rewritable tire pressure detector" is comprised of "a micro-processing module"; a "sensing module"; a "transmitting module"; a "power module"; and an "interface." Appx128-129. The "portable setting apparatus" is comprised of a "control module"; an "input module"; a "receiving module"; a "setting output module"; and a "power source." Appx128-129. The patent depicts each component as a generic box in its figures, and the written description does not provide any specificity beyond the component's name and high-level function. *See* Appx112-118.

The unrebutted evidence demonstrated that these components are generic, were well-understood at the time of the alleged invention, and are implemented in the claimed systems in a conventional way. That evidence consisted of testimony from Dr. Souri, Autel's expert; testimony from McAlexander, Orange's expert; and testimony from Hung Chih Yu, the inventor of the '064 patent.

Autel's expert, Dr. Souri, provided a detailed, element-by-element discussion on how each element of the asserted claims involve well-understood, routine, and conventional technology, and that their combination also was

known by a person of ordinary skill in the art. *See* Appx2866-2956. For example, he explained that the claim limitation requiring a "portable setting apparatus" to update the new tire pressure detector was "well-known, routine, and conventional at the time of the claimed invention," because "[a] person of ordinary skill would have known," based on both the "prior art" and the person's "knowledge," that car mechanics use "handheld devices" and other mobile equipment such as a "laptops" to program tire pressure monitoring systems in vehicles. Appx2917-2919. He provided similar testimony for all the other limitations in the asserted claims. *See* Appx2866 ("tire pressure detecting system"); Appx2867 ("identification rewritable tire pressure detector"); Appx2871 ("power module"); Appx2869 ("sensing module"); Appx2870 ("transmitting module"); Appx2872 ("power module"); Appx2872-74 ("interface"); Appx2920 ("control module"); Appx2921 ("input module"); Appx2922 ("receiving module"); Appx2924-2926 ("output module"); Appx2927 ("power source"); Appx2931, 2937-2940 ("obtaining an update identification"); Appx2933 ("stor[ing] the update identification"); Appx2934-2935, 2941-2942 ("generating the external signal"), Appx2944-2955 ("acquir[ing] the update identification"); Appx2946-2947 ("overwrit[ing] the preset identification"); Appx2943 ("record[ing] the update identification").

Dr. Souri's testimony was consistent with this Court's precedents. This Court repeatedly has held that claims that merely use generic and well-known components lack inventive concepts as a matter of law. *See, e.g.*, *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1364 (Fed. Cir. 2023) ("data processing system[s]," processors," and "memory" are "generic computing terms"); *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365-66 (Fed. Cir. 2020) ("digital or analog signal receiver and/or transmitter capable of accepting a signal transmitting any kind of digital or broadcast information" is "generic and functional hardware"); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("controller[s]," "interface[s]" and "wireless data transmitter[s]" are "conventional components"); *In re TLI*, 823 F.3d at 614 (generic components include "communication controller[s]," "data storage unit[s]" with "transmission functions," "interface[s]," and "computer[s] that receive[] and send[]" information over a network (internal quotation marks omitted)).

Orange's expert, McAlexander, conceded that "each of the identified independent components that are required by the claim may be available in a toolbox [of] the person with ordinary skill in the art," and were conventional at the time of the alleged invention. Appx3157-3161. He further testified that wireless communication was a conventional technique at the time

of the alleged invention using the generic components of the claimed system, including "a rewritable memory unit" and microprocessor, "sensing modules," "transmitting modules," "receiver modules," a "power source or power module," and a "setting apparatus." Appx3157-3161. He also conceded that the state of the art at the time of the alleged invention included TPMS products that included sensors with only one "identification recorded therein," Appx3163-3165, and tire pressure sensors with components that were "involved in inputting an ID and later transmitting that ID to the transmitters" in a vehicle, Appx3165-3167. McAlexander nevertheless asserted that the combination of these generic elements was inventive. Appx3157. As discussed below, that was insufficient as a matter of law. *See* pp. 32-36, *infra*.

Yu, the inventor of the '064 patent, testified that at the time of the alleged invention, "other companies already had TPMS products on the market using sensors and handheld tools." Appx2067. These products had "a sensor in each tire to sense and detect the pressure inside the tires," "an integrated circuit inside the sensor with a memory inside the integrated circuit," "transmission circuitry and an antenna to send wireless RF signals," and a "handheld tool to send the location of each sensor to the receiver or ECU in the car." Appx2606-2609. He further testified that Orange's own

products that predated the '064 patent also used many of the generic components described in the claims, such as "a power source in the form of a battery inside the sensor," "transmission circuitry and an antenna to send RF signals" within the sensors, and "an integrated circuit with a microprocessor having a rewritable memory." Appx2613-2614.

The bottom line is that the claims here use a "conventional ordering of steps" that involves "processing," "routing," controlling," and "monitoring data" through the use of "conventional technology to achieve the desired result." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017). The claims accordingly "fail[] to transform the abstract idea into something more" at *Alice* step two. *Id.*

### 2. There Is No Evidence Of Inventiveness

The district court pointed to two pieces of evidence that, in its view, supported the jury's finding at *Alice* step two. It was mistaken on both.

First, the district court cited conclusory testimony from Orange's expert, McAlexander, that the asserted claims "'created a unique way of combining [] elements' already known in the art" and that "'the specific structural and functional arrangements' recited by the limitations of the As-

serted Claims 'set[] forth [a] technical improvement over the existing systems that were prevalent at that time.'" Appx50 (quoting Appx3157). That testimony is insufficient to establish inventiveness as a matter of law.

It is well-established that an expert's bare assertion that claims recite an "inventive concept" without any substantiating evidence or "additional rationale" is insufficient to support the jury's verdict. *Move, Inc. v. Real Est. All. Ltd.*, 721 F. App'x 950, 957 (Fed. Cir. 2018); *see CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1176 (Fed. Cir. 2005) (an expert's "general and conclusory" testimony is not substantial evidence to support a jury's validity verdict). Here, McAlexander offered only a bare assertion of inventiveness. He did not explain *why* the combination of elements in the asserted claims was unique – he simply stated that that was the case. Appx3157. Likewise, he did not articulate *how* the structural arrangements recited in the asserted claims amounted to a technical improvement over the systems that existed at the time of the alleged invention. Appx3157.

McAlexander's testimony is indistinguishable from expert testimony that this Court has held insufficient at *Alice* step two. For example, in *cxLoyalty, Inc. v. Maritz Holdings Inc.*, 986 F.3d 1367 (Fed. Cir. 2021), this Court held that an expert testimony's that the claims at issue (relating to a method for using loyalty program points with third-party vendors) recite a

"novel combination of technical elements" that provide "technological solutions to [a] technological problem within the loyalty awards industry" was insufficient to establish inventiveness. *Id.* at 1378. The Court explained that the testimony "merely labels, in conclusory fashion, the invention as a technological solution to a technological problem," and thus should be afforded no weight. *Id.* The Court likewise held in *Move*, in the context of a claimed method for finding real estate on a computer, that an expert's bare statement that the "claimed system was considered neither routine nor conventional" at the time of the alleged invention was insufficient to show patentability. 721 F. App'x at 957.

Here, McAlexander provided the same type of conclusory testimony that this Court deemed insufficient in *cxLoyalty* and *Move*. He failed to identify for the jury how or why the asserted claims were inventive, and did not identify any evidence supporting his opinions. His "bald assertion" of inventiveness cannot "satisfy the inventive concept requirement." *Move*, 721 F. App'x at 957.

Second, the district court cited testimony from McAlexander that the "technical solution" of "adjusting and changing the identity of each wheel without adjusting the vehicle's controller" provided the inventive concept. Appx51 (alterations adopted) (quoting Appx3158). That was insufficient as

a matter of law, because it merely described the abstract idea of reading an identifier from one tire pressure detector and copying it to another detector.

A claim's inventive concept "cannot be . . . the abstract idea that the claims are directed to." *Chamberlain*, 935 F.3d at 1349. Orange had to "point to [an] inventive concept presented in the ordered combination of elements beyond" the abstract idea of cloning a tire pressure detector's identifier. *Id.*; *see BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) (the "claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept").

McAlexander's testimony merely restated that the asserted claims recite a way to update a tire pressure detector's identification. He did not point to any "additional features" that demonstrated that the asserted claims were "more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221 (alteration adopted). In other words, McAlexander was unable to articulate what was special or unconventional about the asserted claims beyond the fact that they implemented the abstract idea.

Testimony like McAlexander's cannot satisfy a patentee's showing at *Alice* step two. If that were the case, then patentees could manufacture a dispute of fact at summary judgment with an expert's conclusory statement

that the claims disclose some unidentified inventive concept, and then win at trial with those same opinions. That would render *Alice* step two a dead letter. For this reason also, the record lacked substantial evidence to support the jury's verdict. The Court should hold that the asserted claims are invalid under Section 101 and *Alice*.

## II. THE ASSERTED CLAIMS ARE OBVIOUS

In the alternative, the Court should hold that the asserted claims are invalid as obvious. *See, e.g.*, *Boston Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009) ("When we consider that, even in light of a jury's findings of fact, the references demonstrate an invention to have been obvious, we may reverse its obviousness determination.").

*Standard of Review*

The Court "reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence." *TI Grp.*, 375 F.3d at 1133 (internal quotation marks omitted).

### A. Nihei And Nantz Disclose Every Limitation Of The Asserted Claims

"A claimed invention is unpatentable if the differences between the claimed invention and the prior art are such that the claimed invention as

a whole would have been obvious to one of ordinary skill in the art." *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1343 (Fed. Cir. 2017) (internal quotation marks omitted). Whether an invention is obvious depends on "the scope and content of the prior art"; "differences between the prior art and the claims at issue"; and "the level of ordinary skill in the pertinent art." *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 102 F.4th 1280, 1291 (Fed. Cir. 2024) (internal quotation marks omitted). In addition, "secondary considerations," including industry praise of the alleged invention, "may be relevant as indicia of obviousness." *Id.* (internal quotation marks omitted). The burden is on the party asserting obviousness to show that the claims are obvious by clear and convincing evidence. *Allergan, Inc. v. Sandoz, Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013).

1. The trial evidence clearly showed that the asserted claims are obvious in light of two prior art references, U.S. Patent Application Publication No. 2007/0055411 (Nihei) and U.S. Patent Application Publication No. 2006/0208864 (Nantz).

Nihei is a patent application directed at a "wheel information-acquiring system" that "gathers information from wheels, tire pressure being one of them." Appx2860. Nihei teaches a system of "setting [an] ID . . . for a

tire pressure monitoring system" that is comprised of a tire pressure monitor and an "apparatus that communicates . . . with the sensor back and forth." Appx2861. That apparatus comprises a "setting device" that is connected to a "PC," which can receive a "manual input[]." Appx3755.

Nantz is a patent application directed at "a tire pressure monitoring sensor and system." Appx2861. Nantz claims a system that is directed at "TPMS and the wireless setting of IDs." Appx2861-2862. Nantz's tire pressure monitoring detectors are equipped with "antenna[s] . . . for wireless communications" with a setting apparatus, which "communicates with the sensor to set the ID." Appx2862. In particular, Nantz teaches that when an existing detector is damaged and must be replaced, the setting apparatus can set the ID of a new detector to that of the existing detector. Appx3743.

Autel's expert, Dr. Souri, explained to the jury that each limitation of the asserted claims is taught by the combination of Nihei and Nantz. Appx2855-2949. His testimony about the limitations in claim 26 of the '064 patent is summarized in the following chart:

| **Claim Limitation** | **Dr. Souri's Testimony About Nihei And Nantz** |
|---|---|
| "A tire pressure detecting system, comprising: | "Nihei discloses a tire pressure detecting system." Appx2865. |
| "an identification rewritable tire pressure detector used for being in- | "Nihei's sensor" "communicates with . . . the microprocessor," which "communicates with the memory." |

| | |
|---|---|
| stalled in a vehicle, the identification rewritable tire pressure detector comprising: a micro-processing module having a rewritable memory unit to record an identification" | Appx2867. Nihei paragraph 45 teaches that "the ID contained in the signal supplied to . . . the microprocessor," where it is "stored and held as a new ID in the transmitter in the memory." Appx2867. |
| "a sensing module electrically connected to the microprocessor module and having a pressure-detecting unit to detect a tire pressure and send a detection result to the microprocessing module" | Nihei's figure 2 shows "the sensor," along with "the pressure detector, the microprocessor, [and] the memory." Appx2868. Nihei paragraph 38 discloses "a microprocessor, a memory, and the microprocessor stores and holds the new ID in the memory, according to a signal from the – that it receives." Appx2868. |
| "a transmitting module controlled by the micro-processing module to transmit a radio frequency (RF) signal, wherein the RF signal comprises the detection result and the identification of the identification rewritable tire pressure detector" | Nihei's figure 2 shows "that the inner pressure data, along with the ID, and it's done using radio frequency signals, per the requirement of the claim." Appx2870. |
| "a power module electronically connected to the micro-processing module to supply power to the identification rewriteable tire pressure detector" | Nihei figure 2 shows "the battery, power module, that's electronically connected to the microprocessor MP, and it supplies power to the memory." Appx2871. |
| "an interface arranged to receive an external signal and send the external signal to the micro-processing module, wherein the external signal comprises an external identification to be written into the rewriteable memory unit or to be used to overwrite a preset identification in the rewriteable memory unit" | Nihei discloses a "microprocessor" that "extracts" an "ID contained in [the] signal" and then "stores it in the memory." Appx2873. Nantz teaches that if a detector "is damaged . . . it's possible to read the ID and use that ID to transmit it to a replacement sensor." Appx2873. |
| "a portable setting apparatus arranged to communicate with the | Nihei discloses that "the setting device and the controller together |

| | |
|---|---|
| identification rewriteable tire pressure detector, comprising:" | form the setting apparatus." Appx2917. Nihei paragraph 72 "talks about [a] setting device [that] is moved near the wheel Installation position" and thus is "portable to the vehicle." Appx2918. |
| "a control module" | Nihei paragraph 61 "discloses a personal computer, PC, that is used to generate the radio frequency signal." Appx2919-2920. |
| "an input module connected to the control module to enable an operator to manually input an identification to be written into the identification rewriteable tire pressure detector" | Nihei paragraphs 61, 67, and figure 4 disclose "manually inputting the installation position information." Appx2921. The input module would be "a keyboard on a laptop or a keypad on a tablet, for example." Appx2921. |
| "a receiving module connected to the control module to receive the RF signal from the identification rewriteable tire pressure detector or a tire pressure detector and to send the RF signal to the control module" | Nihei paragraph 61 "discloses the setting device" which is "configured by including antennas" that "have a transmitter and a receiver portion." Appx2922-2923. The antenna "is configured to receive a radio wave." Appx2923. |
| "a setting output module controlled by the control module to send the external signal to the interface of the identification rewriteable tire pressure detector, wherein the external signal is generated by the control module and comprises the identification that is provided by the input module or provided by the RF signal received from the receiving module" | Nihei paragraphs 61 and 63 and figure 4 "disclose[] the setting device with antennas and a transmitter" which are "configured to emit the radio wave . . . to be transmitted to the transmitter." Appx2924-2945. Nantz teaches that if a "sensor happens to be damaged," "the ID can be read from this damaged [sensor] and transmit[ed] [using] a low frequency signal." Appx2925. |
| "a power source connected to the control module to supply power to the setting apparatus" | Nihei figure 4 shows a PC, and "a person of ordinary skill would have known that a PC would need a power source." Appx2927. |

| | |
|---|---|
| "wherein the portable setting apparatus is not equipped in the vehicle and is portable relative to the vehicle, and is configured to:" | Nihei "discloses . . . its own setting device with the PC being movable to locations where it's needed near the vehicle." Appx2928. |
| "obtain an update identification to be written into a new identification rewriteable tire pressure detector either by (1) receiving the RF signal from an old tire pressure detector by the receiving module, retrieving an old identification of the old tire pressure detector from the RF signal, and using the old identification as the update identification, or by (2) receiving a manual input of the identification from the input module, and using the identification as the update identification, wherein the old tire pressure detector stores only the old identification;" | Nihei paragraphs 61 and 63 and figure 4 disclose "the setting device that can receive the RF signal," "extract the ID from that signal, and use it as the new update." Appx2929-2930. Manual inputting is "also disclosed in paragraph 63 because it talks about manual inputting of an ID to be set for the transmitter." Appx2930. Nantz discloses "[r]etrieving the old ID" because it teaches that "when the TPM sensor is damaged," the setting apparatus "may read the ID of the damaged TPM sensor . . . wirelessly." Appx2930. Nihei paragraph 75 shows that "the ID of the sensor would be unique to each of the . . . sensors." Appx2931. |
| "store the update identification in the setting apparatus;" | Nihei paragraph 63 "discusses . . . inputting the ID to be set for the transmitter"; "obviously the information would have to be store in the setting apparatus." Appx2932. |
| "generate the external signal comprising the update identification as the external identification, and send the external signal to the new identification rewriteable tire pressure detector such that the new identification rewriteable tire pressure detector records the update identification in the rewritable memory unit or overwrites the preset identification in the rewritable | Nihei teaches "a signal containing an ID to be set." Appx2934. Nantz "teaches that the ID can be read from the damaged sensor and then used as the new . . . ID to the new sensor." Appx2934. Nihei discloses that "the signal is transmitted to each of the sensors." Appx2934. |

| | |
|---|---|
| memory unit by the update identification, wherein the external identification is from the old tire pressure detector, and the external signal is a low frequency (LF) signal." | |

Dr. Souri then went through each of the limitations in claim 27, most of which he explained "are identical" to the limitations in claim 26, and demonstrated that Nihei and Nantz taught each of those limitations as well. Appx2935; *see* Appx2936-2937 (first 14 limitations of claim 27, which are identical to those in claim 26); Appx2937-2948 (remaining 5 limitations of claim 27).

Dr. Souri also testified that a person of ordinary skill in the art (POSITA) would be motivated to combine Nihei and Nantz. He explained that both Nihei and Nantz "address TPMS" generally and "the issue of changing the sensor ID" specifically, and that they both did so in the same way: "they both have a setting apparatus or a setting tool, and they both communicate wirelessly." Appx2862. Dr. Souri explained that "as a POSITA, putting myself in the shoes of a POSITA, and wanting to copy an ID from an old sensor and paste it into a new sensor wirelessly, I would take advantage of the radio frequency communication channels that are described in Nantz and Nihei and the setting of IDs to combine them together." Appx2862.

2. In its post-trial briefing in the district court, Orange identified only two limitations in the asserted claims – the requirements that the setting apparatus be "portable" and allow for "manual input" – that it contended Nihei and Nantz did not disclose. Appx3507. It was wrong because Nihei discloses those limitations.

The asserted claims recite a "portable setting apparatus" that is "not equipped in the vehicle and is portable *relative to the vehicle*" and can communicate with the "identification rewritable tire pressure detector." Appx128-129 (emphasis added). The asserted claims further specify that the "portable setting apparatus" has a "control module" that includes an "input module" that "enable[s] an operator to manually input an identification to be written into the identification rewritable tire pressure detector." Appx128-129. Thus, under the plain language of the claims, a "portable setting apparatus" means a device with an input method such as keyboard that can be moved to and from the vehicle (*i.e.*, "portable relative to the vehicle"). The device does not need to be "portable" in the sense that it is handheld, and Orange never requested that construction.

Dr. Souri explained that Nihei discloses a "portable setting apparatus" with manual input capabilities. Nihei discloses a "setting device" and "controller" that, together with a "PC," "form the setting apparatus." Appx2917.

Dr. Souri testified that a POSITA would understand this setting apparatus to be portable because "PCs, personal computers, can be desktops, can be laptops, can be tablets." Appx2918. He elaborated that these are "mobile devices, and they can be attached to other tools and equipment to control them." Appx2918. He explained that that these devices can be "portable to the vehicle," because they can be "move[d] around" the vehicle to "program the sensors in the wheels" of the vehicle. Appx2918. He further explained that Nihei discloses that users can "manually input" an identification into the setting apparatus "from the PC." Appx2918.

McAlexander attempted to rebut Dr. Souri's testimony, but failed. McAlexander testified that Nihei does not disclose the "portable setting apparatus" of the asserted claims. Appx3154-3156. He testified that Nihei's setting device is not "portable" because it is "tethered to a personal computer." Appx3154-3156. But he made clear that he was using "portable" in the sense of "handheld," which is not how that term is used in asserted claims. Appx2690. He admitted on cross-examination that the "PC" and "setting apparatus" disclosed in Nihei "can move independently" from a vehicle – in other words, that they are "portable relative to [the] vehicle," as recited in the claims. Appx3167-3168. He further admitted that a "PC" can be a "laptop," which is portable in any sense of the word. Appx3166.

McAlexander also testified that Nihei does not disclose the "manual input" limitation of the "portable setting apparatus" in the asserted claims, because in his view the setting device in Nihei "does not have any manual input." Appx3154. He testified that "the manual input is done only through the keyboard of a computer, and that is not part of any portable device." Appx3155. Again, that testimony was contradicted by his admission on cross-examination that Nihei's PC can be a laptop, which obviously can include a keyboard for manual input. Appx3166. And he never rebutted Dr. Souri's testimony that a POSITA would consider Nihei's setting device together with the PC to be the claimed "setting apparatus."

In upholding the jury's verdict of non-obviousness, the district court cited solely the "portable" limitation, relying on McAlexander's testimony that Nihei does not disclose a "portable setting apparatus" because the setting device in Nihei is tethered to a personal computer. Appx55. That testimony is not substantial evidence that could support the jury's verdict, because it ignores McAlexander's admission that Nihei's PC could be a laptop and that the PC and setting device "can move independently" from a vehicle and thus are "portable" within the meaning of the claims. Appx3166-3168; *see, e.g.*, *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (a find-

ing of fact cannot be based on a witness's "story" that is "internally inconsistent or implausible on its face"); *Heelen v. Dep't of Com.*, 154 F.3d 1306, 1312 (Fed. Cir. 1998) (similar).

McAlexander's testimony is just like the testimony the Court held to be insufficient in *Koninklijke Philips N.V. v. Zoll Medical Corp.*, 656 F. App'x 504 (Fed. Cir. 2016). In that case, the jury concluded that an asserted claim, involving a method for performing a self-test in an automated external defibrillator, was not anticipated by a prior art reference. 656 F. App'x at 513. The defendant's expert explained to the jury how the reference disclosed every element of the asserted claim. *Id.* The plaintiff's expert disputed that the reference disclosed one of the elements of the asserted claim, but offered only "a factually incorrect" and "conclusory statement" in support of that argument. *Id.* This Court reversed the district court's denial of the defendant's motion for judgment as a matter of law on invalidity grounds because the expert's statement was "insufficient to sustain a jury's verdict." *Id.* at 514 (citation omitted).

The same is true here – by McAlexander's own admission, Nihei discloses a setting apparatus that is portable and has manual input capabilities. *See* Appx3167-3168. The unrebutted evidence thus demonstrated that Nihei and Nantz disclose all the limitations of the asserted claims.

### B. Orange's Remaining Arguments Fail

Orange made two additional arguments for why the asserted claims are non-obvious. The district court did not reach either argument, and neither is correct.

1. First, Orange argued that Nantz teaches away from the alleged invention. Appx3507. It is wrong.

"If a person of ordinary skill in the art reviewing a prior art reference would be discouraged from pursuing the claimed solution because the reference suggests that the developments flowing from its disclosures are unlikely to produce the objective of the applicant's invention, the reference is said to teach away." *In re Brandt*, 886 F.3d 1171, 1178 (Fed. Cir. 2018) (citation and internal quotation marks omitted). "A prior art reference evidences teaching away if it criticizes, discredits, or otherwise discourages the solution claimed." *Id.* (alterations and internal quotation marks omitted).

This standard is demanding and requires the prior art reference to clearly criticize or discredit the claimed invention. A prior art reference's "mere disclosure" of an alternative solution, without more, is not evidence of teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Similarly, evidence that a prior art reference "expresses a general preference for

an alternative solution" does not teach away unless the reference specifically "criticize[s], discredit[s], or otherwise discourage[s] investigation into the claimed invention." *Meiresonne v. Google, Inc.*, 849 F.3d 1379, 1382 (Fed. Cir. 2017) (internal quotation marks omitted). Even evidence that a prior art reference describes the invention "as somewhat inferior to some other product for the same use" does not render an otherwise "known or obvious composition . . . patentable." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

Nantz does not teach away from the alleged invention. Before the district court, Orange pointed to the fact that Nantz discloses a system in which the tire pressure monitoring sensors communicate with the setting apparatus using a low frequency transmitter, Appx3011, whereas the '064 patent recites higher frequency "radio frequency [] signal[s]," Appx128. But Nantz does not teach away from using a radio frequency signal: It does not criticize using radio frequency signals or even say that low frequency signals are better than other types of signals. *See* Appx3011.

As Dr. Souri explained, Nantz was "just saying that there are different ways of setting IDs on sensors or reprogramming vehicle computers with IDs. That's not teaching away. That's just saying there are different ways of doing things." Appx2953. That testimony accurately reflects this Court's

caselaw. *See, e.g.*, *Meiresonne*, 849 F.3d at 1382; *In re Fulton*, 391 F.3d at 1201.

Orange did not elicit any testimony about whether this disclosure from Nantz teaches away from the alleged invention. In its post-trial brief, it relied on a statement from Dr. Souri that "TPMS sensors in the market" "generally" do not have "low frequency transmitters." Appx3507. But that is not evidence that Nantz "criticize[d], discredit[ed], or otherwise discourage[d]" the alleged invention. *In re Brandt*, 886 F.3d at 1178.

2. Second, Orange argued that there is evidence of secondary considerations that supported the jury's verdict, pointing to the industry praise it had received. Appx3507. The evidence it cited is insufficient to establish validity. *See, e.g.*, *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1361 (Fed. Cir. 2015) (rejecting plaintiff's argument that evidence of secondary considerations supported the jury's verdict of validity).

"For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention*." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011); *see ABT*, 797 F.3d at 1361 (although secondary considerations can "sometimes tilt in favor of validity in close cases, they cannot by themselves overcome a convincing case of invalidity without

showing a clear nexus to the claimed invention"). Even if a nexus is established, evidence of secondary considerations "rarely" can "overcome a prima facie case of obviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1354 (Fed. Cir. 2012).

Dr. Souri testified that secondary considerations do not weigh against a finding of obviousness. Appx2950-2953. He testified that there was no evidence that any party's implementation of the alleged invention in consumer products increased "market demand" or caused "consumers [to] want[]" those products "more and more." Appx2950-2951. And he testified that there was no evidence that "link[ed]" any industry praise that Orange received "in particular to the alleged inventions of the" '064 patent. Appx2952.

McAlexander did not attempt to refute this testimony. Instead, he merely stated that the alleged invention was praised by others and pointed to two awards that Orange received. Appx3156. But there was no evidence that those awards were related to the alleged invention in the '064 patent. The first award was for Orange's general programmable system technology. Appx2599, 2605. The second award was from one of Orange's customers for being a "[t]op [s]upplier." Appx2605. Dr. Souri testified that there was no

nexus between these awards and the alleged invention, Appx2952, and Orange did not elicit any contrary testimony.

The record thus is devoid of any evidence suggesting that these awards were given to Orange *because* Orange's products practice the alleged invention. And even if there was some connection between the awards and the alleged invention, that connection would be too vague and nonspecific to establish non-obviousness. *See ABT*, 797 F.3d at 1361.

This case is just like *Metso Minerals, Inc. v. Powerscreen International Distribution, Ltd.*, 526 F. App'x 988 (Fed. Cir. 2013). In that case, involving a patent for an industrial machine used to sort rock or rubble based on size, the Court reversed the district court's denial of the defendant's motion for judgment as a matter of law on obviousness grounds. *Id.* at 998. The plaintiff argued that secondary considerations of the commercial success of the its products supported the jury's verdict. *Id.* The Court concluded that this evidence was insufficient to support the jury's verdict because there was nothing that linked the commercial success of those products to the claimed advances in the asserted patents. *Id.*

Orange, like the plaintiff in *Metso*, failed to "establish a nexus" between the evidence of secondary considerations and the alleged invention, so those secondary conditions cannot rescue its claims. 526 F. App'x at 998.

The Court accordingly should hold that the asserted claims are invalid because they are obvious.

## III. AUTEL DID NOT DIRECTLY INFRINGE THE ASSERTED CLAIMS

The Court should affirm the district court's judgment of non-infringement. The district court correctly found that there was no substantial evidence that Autel sold, offered to sell, or imported the accused products in the United States. The Court also could affirm for the separate reason that the accused products do not practice all of the limitations of the asserted claims.

*Standard of Review*

The Court reviews "decisions on motions for [judgment as a matter of law] . . . under the law of the regional circuit." *Network-1 Techs., Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015, 1026 (Fed. Cir. 2020). "The Fifth Circuit reviews decisions on motions for [judgment as a matter of law] de novo." *Id.* (citation and internal quotation marks omitted). "In the Fifth Circuit, a jury verdict may only be reversed by [judgment as a matter of law] if substantial evidence does not support the verdict." *Id.*

### A. Autel Did Not Sell, Offer To Sell, Or Import The Accused Products In The United States

Orange's sole claim against Autel is for direct infringement under 35 U.S.C. § 271(a). That provision states that a party directly infringes a patent when it "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention." 35 U.S.C. § 271(a). "It is well-established that the reach of section 271(a) is limited to infringing activities that occur within the United States." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1375 (Fed. Cir. 2005); *see Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 441 (2007). The plaintiff bears the burden of demonstrating that the defendant's activities fall within the scope of Section 271(a). *MEMC*, 402 F.3d at 1367.

Here, Orange argues (Br. 1) that the record evidence shows that Autel sold, offered to sell, or imported the accused products in the United States. Orange is mistaken.

#### 1. Autel Did Not Sell The Accused Products In The United States

The district court correctly concluded that there was no substantial evidence that Autel sold the accused products in the United States. All of the evidence bearing on this issue was introduced at trial by Autel and is

undisputed. *See* Appx36. Orange did not introduce any evidence of its own that contradicted Autel's evidence.

**a. The unrebutted evidence showed that Autel did not sell the accused products in the United States**

1. For a defendant to have "sold" an accused product in the United States, the defendant's activities "in the United States" must have been "sufficient to constitute a 'sale.'" *Halo*, 831 F.3d at 1377. All activities that occurred outside of "the borders of the United States" are disregarded. *MEMC*, 420 F.3d at 1377 (citation omitted). If there is "[a]ny doubt as to whether" a defendant's activities in the United States "constitute[] a sale within the United States under § 271(a)," those doubts are resolved in the defendant's favor under "the presumption against extraterritorial application of United States laws." *Halo*, 831 F.3d at 1378.

A defendant sells an accused product abroad "when substantial activities of a sales transaction, including the final formation of a contract for sale encompassing all essential terms as well as the delivery and performance under that sales contract, occur entirely outside the United States." *Halo*, 831 F.3d at 1378. That is true even if the defendant engaged in other related activities in the United States. *See id*. For example, in *Halo*, the Court concluded that the defendant did not sell its products in the United

States because it designed and manufactured the products in Asia and delivered those products to buyers outside of the United States, which then sold those products to end-users in the United States. *Id.* at 1373-74. The Court held that no direct infringement occurred even though the defendant "engaged in pricing negotiations in the United States," met "regularly with [United States-based] design engineers, sen[t] product samples to [United States-based end-users], attend[ed] sales meetings with its [United States-based] customers, and provided post-sale support for its products" in the United States. *Id.* at 1374. Those ancillary activities, the Court explained, were not the core activities of the sales transaction. *See id.*

Similarly, in *MEMC*, the Court concluded that the defendant did not sell its products in the United States when it manufactured the products abroad and delivered them to a Japanese company abroad. 420 F.3d at 1373. The Court explained that "all of the essential activities" surrounding the sales "took place" abroad and that there was no evidence that any "contracting and performance" activities occurred in the United States. *Id.* at 1377. The plaintiff pointed to undisputed evidence that the defendant knew that the products ultimately were to be used in the United States, including that the Japanese company was an intermediary that resold the products to an affiliated U.S. company; that the defendant "attache[d] a packaging

label" to its products "that indicate[d] the destination of the [products] to be Austin, Texas"; "email[ed]" the U.S. company certain "test data" relating to the products "for shipment authorization"; and "provide[d] crucial follow-up technical support" to the U.S. company. *Id.* at 1373, 1375. But the Court concluded that that evidence of intent was insufficient to show a sale in the United States, when the defendant's actual contracting and performance took place abroad. *Id.* at 1377.

2. Here, the evidence showed that Autel did not sell the accused products in the United States. There were three key pieces of evidence at trial: (1) the testimony of Jieying Chen, Autel's sales operations manager, Appx3033-3086; (2) the distribution agreement between Autel and Autel U.S., Appx7241-7267; and (3) sales contracts and commercial invoices between Autel and Autel U.S., Appx9051-9068. This evidence conclusively establishes that all of Autel's sales activities for the accused products occurred only in China.

First, Chen explained that Autel's sales activities all were outside the United States. She testified that Autel and Autel U.S. are "two separate entities," and that Autel U.S. – not Autel – sells the accused products in the United States. Appx3034-3035. Orange chose to bring this case only against Autel for direct infringement, and not also against Autel U.S.

Appx83-110. This Court has confirmed that principles of corporate separateness apply to direct infringement claims – that is, a company cannot be liable for direct infringement on the basis of a related company's actions, unless the plaintiff meets the high bar for showing that the companies' separate forms should be disregarded. *E.g.*, *Celgene Corp. v. Mylan Pharms. Inc.*, 17 F.4th 1111, 1129 (Fed. Cir. 2021). Here, Orange did not argue at trial that Autel's and Autel U.S.'s corporate separateness should be disregarded, and it put on no evidence that would support that argument. So only Autel's sales conduct is at issue in this case, and not Autel U.S.'s conduct.

Chen further testified that Autel's production and distribution activities all occur within China. She testified that Autel manufactures the accused products after receiving an order from Autel U.S., and after the manufacturing is complete, Autel contacts "Autel U.S. to confirm shipping mode and methods, and the shipping will be carried out by a freight [] order." Appx3036. Autel then delivers the accused products to Autel U.S. at "different ports in China," Appx3039, at which point title of the products is transferred to Autel U.S., Appx3044.

Second, Autel's and Autel U.S.'s distribution agreement showed that Autel's sales activities occurred entirely outside the United States.

Appx7241-7267; *see* Appx3037-3039. Autel signed the agreement in Shenzhen, China, Appx3045-3046, and Chinese law governs the agreement, Appx7256. The distribution agreement states that it "shall become effective only after it has been signed by [Autel U.S.] and has been accepted by Autel at its principal place of business" – Shenzhen, China – "and its effective date shall be the date on which it is signed by Autel." Appx7256. The distribution agreement confirms that "[a]ll orders for Autel Products by [Autel U.S.] shall be subject to acceptance in writing by Autel at its principal place of business." Appx7246. And it says that Autel U.S. "shall arrange, be responsible for and pay all shipping, freight and insurance charges from Autel's point[s] of shipment," which were various Chinese ports. Appx7248. The distribution agreement thus was formed in China, governed by Chinese law, and specified that all of Autel's obligations under the agreement were to occur in China.

Third, the invoices and sales contracts from Autel to Autel U.S. for the accused products confirmed that Autel's sales activities all occurred outside the United States. The invoices and sales contracts were issued in Shenzhen, China, and were made "FOB NET SHENZHEN CHINA" for shipment from "SHENZHEN, CHINA," with "USA" as the "Destination" or "Port of

Destination." Appx9053-9054. The "FOB" designation is "a standard commercial term used to allocate the risks and responsibilities of the buyer and seller." *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1033 (Fed. Cir. 2022) (citing *Free on Board*, Black's Law Dictionary (11th ed. 2019)). Specifically, the FOB designation means that "legal title and thus the risk of loss passes from seller to buyer" at the specified location. *MEMC*, 420 F.3d at 1374 n.3. Here, that location was Shenzhen, China. Appx9054.

3. The district court correctly concluded that Autel did not sell the accused products in the United States. Appx37-39. The court explained that the key question is whether the "substantial activities" of the sales transaction occurred outside the United States, including "the final formation of a contract for sale encompassing all essential terms" and "the delivery and performance under that contract." Appx37 (quoting *Halo*, 831 F.3d at 1378) (emphases omitted). The court reviewed all of the undisputed evidence, which showed that the "final formation" of the sales contracts was in China, Appx37-38 & Appx37 n.10; that Autel signed the distribution agreement in China, Appx37 n.10; that under the agreement, orders for Autel products are not valid until Autel accepts those orders in China, Appx37 n.10; *see* Appx3045-3046, 7246, 7256; and that Autel received orders

in China and issued invoices and sales contracts in China that were "FOB net Shenzhen, China," Appx38; *see* Appx9054.

The court also explained that Autel's "delivery" and "performance" occurred in China, not the United States. Appx38. After receiving and confirming orders in China, Autel manufactured the products in China, and then shipped them to different ports in China, where title to the products passed to Autel U.S. Appx38; *see* Appx3036, 3039, 3044, 9054.

In fact, Autel had even fewer sales activities in the United States than did the defendants in *Halo* and *MEMC*. The defendant in *Halo* engaged in "pricing and contracting negotiations in the United States." *Halo*, 831 F.3d at 1378. There is no evidence of that here. And the defendants in both *Halo* and *MEMC* provided post-sale support in the United States to United States-based end-users of their products. 831 F.3d at 1374; 420 F.3d at 1375. There is no evidence that Autel did the same with respect to the accused products.

In short, the district court correctly concluded that "all of the essential activities" of Autel's sales of the accused products to Autel U.S. took place in China, and no evidence showed that any "contracting" or "performance" activities occurred in the United States. *MEMC*, 420 F.3d at 1373; *see*

Appx38 (district court's conclusion that "the contract for the goods, delivery, performance, and possession of the goods took place in China").

**b. Orange's arguments lack merit**

Orange argues (Br. 12-22) that the district court misapplied this Court's precedents. Orange also argues (Br. 5-9) that the district court ignored evidence that supported the jury's verdict. It is wrong on both counts.

1. Orange contends (Br. 12-16) that the district court misapplied *Halo*. Orange argues (Br. 13) that *Halo* is distinguishable because the defendant in that case sold the accused products to a foreign intermediary, which in turn sold the accused products in the United States, whereas Autel sold the accused products to a U.S.-based company. Orange argues that this case is instead governed by two cases where there were no foreign intermediaries, *Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353 (Fed. Cir. 2008), and *SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1370 (Fed. Cir. 2010). The district court correctly rejected this argument because Orange is wrong about *Halo*, and *Litecubes* and *SEB* are inapposite. Appx39-40.

The Court's decision in *Halo* did not turn on the fact that the defendant sold to a foreign intermediary. Instead, the Court focused on where the "substantial activities of [the] sales transaction" occurred. 831 F.3d at 1378.

The Court did not attach any significance to the intermediary's nationality, let alone set out a strict rule that a sale to a U.S. intermediary always constitutes a sale "within the United States" under Section 271(a). *See id.* at 1377-78. As the district court explained, nothing in *Halo* suggests that "the corporate home of the purchasing entity . . . determine[s] the location of a 'sale'" under Section 271(a). Appx40. The same is true for *MEMC*, where the Court explained that the location of a sale is the location where "all of the essential activities" of the sale took place; the Court did not focus on the intermediary's nationality. 420 F.3d at 1377.

Orange's authorities, *Litecubes* and *SEB*, are not to the contrary. Neither sets out a rule that a sale to a U.S. entity is a sale within the United States. Instead, the holding in each was much more limited: The Court held that evidence that the defendant sold the products at issue "FOB" a foreign destination does not, by itself, overcome evidence of sales activities in the United States. *See* Appx39-40.

Starting with *Litecubes*: There, the defendant did not dispute that it sold and shipped the accused products directly to customers located in the United States. 523 F.3d at 1369. Its argued only that it could not be liable because it shipped the accused products FOB Canada. *Id.* The Court disa-

greed, concluding that "simply because goods were shipped f.o.b." to a foreign destination did not overcome the evidence that the defendant sold and delivered the products directly to the United States. *Id.*

*SEB* was similar: There, the evidence showed that the defendant sold and shipped the products at issue to customers in the United States. 594 F.3d at 1375. As in *Litecubes*, "the only evidence" on which the defendant relied "to argue that its sales occurred overseas" was that it "delivered its products to [three American companies] f.o.b. Hong Kong or mainland China." *Id.* Citing *Litecubes*, the Court again held that FOB terms do not definitively establish that the sale occurred abroad. *Id.*[2] As the district court here observed, Autel "presented substantial evidence of much more than 'simply' f.o.b. terms to demonstrate that its sales occurred in China." Appx40.

---

[2] *SEB* is otherwise of limited precedential value because of the standard of review the Court applied in that case. The defendant challenged the jury instructions relevant to direct infringement, but had failed to object to those instructions. 594 F.3d at 1375. The Court's review thus was only for "fundamental error" – a standard "more egregious than the 'plain' error that can excuse a procedural default in a criminal trial and is so serious and flagrant that it goes to the very integrity of the trial." *Id.* (internal quotation marks omitted). The Court concluded that there was no fundamental error in the instructions in light of the evidence of sales in the United States. *Id.*

Orange also cites (Br. 5-6, 22) *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576 (Fed. Cir. 1994). That case addressed personal jurisdiction, not Section 271(a). *See id.* at 1578-80. This Court held that a defendant that had sold an infringing product to a buyer based in Illinois could be subject to personal jurisdiction in that state, even though the "goods destined for Illinois were delivered [f.o.b.] in Texas and California." *Id.* at 1577-78. That analysis about the due-process limitations on personal jurisdiction under the stream-of-commerce analysis does not answer the question whether there has been a "s[ale]" "within the United States" within the meaning of Section 271(a).

Ultimately, Orange's argument boils down to nothing more than intent. Its view (Br. 2, 8-9) is that because *Autel U.S.* is a U.S. intermediary that could be expected to ship the products to the United States and sell the accused products to U.S. end users, *Autel* sold the accused products in the United States. But this Court has never held that intent is dispositive of the Section 271(a) inquiry. Appx40. That would not be consistent with the text of Section 271(a), which states that a defendant can be liable if the defendant "*sells* any patented invention[] within the United States." 35 U.S.C. § 271(a) (emphasis added). That language focuses on the location of the defendant's conduct, not its intent.

Orange's argument also is not consistent with the presumption against the extraterritorial application of federal law, a presumption that "applies with particular force in patent law." *Microsoft*, 550 U.S. at 454-55. Focusing on a foreign defendant's intent over its conduct would allow the patent laws to regulate wholly foreign conduct. Yet it is black-letter law that the patent laws "do not, and were not intended to, operate beyond the limits of the United States." *Halo*, 831 F.3d at 1379 (internal quotation marks omitted).

In light of these principles, this Court made clear in *MEMC* that intent to sell in the United States alone is not sufficient. There, the Court squarely held that the "[m]ere knowledge that a product sold overseas will ultimately be imported into the United States is insufficient to establish liability under section 271(a)." 420 F.3d at 1377. Although there was clear evidence that the defendant intended for its products to be sold in the United States, including because it placed "Austin, Texas" labels on its packages, the Court held that the defendant had not sold the products in the United States. *Id.* That is the situation here: Even if the jury could conclude that Autel believed that Autel U.S. would later sell the products in the United States, including because the sales contracts listed "USA" as

the ultimate destination of the accused products, that is insufficient for liability under Section 271(a) because all of Autel's sales activities occurred in China.

2. Orange next contends (Br. 8-9, 18-19) that there is evidence that Autel engaged in sales activities in the United States. It offers only speculation, not evidence.

First, Orange argues (Br. 9) that Autel "was the entity that actually shipped [the accused products] to the U.S." That argument has no support in the record. Orange cites (Br. 9) testimony from Chen where Chen explained that Autel shipped the products *to Autel U.S.* – not to the United States. Appx3052-3059. As the district court recognized, selling to Autel U.S. and selling in the United States "are two different concepts." Appx38 n.11 (internal quotation marks omitted). It is undisputed that Autel U.S. took delivery of the accused products at "different ports in China," Appx3039, and that Autel U.S. then shipped the products to any subsequent destinations, Appx3059, 7248.

Second, Orange argues (Br. 17-19) that there is evidence that the distribution agreement between Autel and Autel U.S. was formed in the United States. That argument is contrary to the agreement itself, which states that it "shall become effective only after it has been signed by [Autel U.S.] *and*

*has been accepted by Autel* at its principal place of business" – Shenzhen, China – "and its effective date shall be the date on which it is signed by *Autel*." Appx7256 (emphases added). In other words, the agreement by its terms was formed in China when Autel signed it in Shenzhen, regardless of where Autel U.S. signed the agreement. Orange entirely ignores this contractual provision.

Orange also points to no evidence showing that Autel U.S. signed the distribution agreement in the United States. The jury did not make a finding that Autel U.S. executed the distribution agreement in the United States, *see* Appx2383, and the record lacks any evidence that would have permitted the jury to make that finding.

Orange speculates (Br. 17-18) that the jury could have inferred that Autel U.S. signed the agreement in the United States because Autel U.S.'s principal place of business is in the United States. Orange never made that argument to the jury, *see* Appx3273-3293, and it lacks record support. Executives of U.S. companies regularly sign agreements in other countries, so there is no reason to believe that a company must have signed an agreement in the United States solely because it is based there. A jury's "freedom to draw inferences from the evidence does not extend so far as to allow" an

inference that "amounts to mere speculation or conjecture." *Mack v. Newton*, 737 F.2d 1343, 1351 (5th Cir. 1984) (internal quotation marks omitted).

At bottom, Orange's argument is just a variation of its argument that Autel must have sold the accused products in the United States because it sold to Autel U.S. and Autel U.S. is a U.S. company. That is all Orange has, and it is not enough. Orange needed evidence that Autel conducted its own sales activities in the United States, and the only record evidence on this point established that those activities occurred exclusively in China.

#### 2. Autel Did Not Offer To Sell The Accused Products In The United States

The district court also correctly concluded that there was no substantial evidence that Autel offered to sell the accused products in the United States. Appx41.

1. This Court has explained that whether a defendant "offers to sell" an accused product "within the United States" under Section 271(a) depends on the "location of the contemplated sale," not on the location of the offer. *Halo*, 831 F.3d at 1380 (quoting *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1309 (Fed. Cir. 2010) (emphasis omitted)). Thus, a defendant can be liable under Section 271(a) if the terms of its offer specify that it will sell an accused product in the United States, even if it made that offer abroad. *Transocean*, 617 F.3d at

1310. But if the terms of the offer specify that it will sell the product abroad, then the defendant is not liable under Section 271(a) even if "the negotiations occurred in the United States." *Halo*, 831 F.3d at 1380. That rule again is grounded in the presumption against extraterritoriality; it ensures that the patent laws do not reach sales that occur outside the United States. *See id.*

Here, as explained, the undisputed evidence shows that the "location of the contemplated sale[s]" of the accused products was in China. *Halo*, 831 F.3d at 1380. Specifically, Autel's sales contracts with Autel U.S. specified that Autel would deliver the accused products to Autel U.S. at ports in China, which Autel did. *See* pp. 57-58, *supra*. There was no evidence that *Autel* contemplated that it would sell the accused products anywhere other than in China. Autel thus did not offer to sell the accused products in the United States.

2. Orange argues that the sales contracts between Autel and Autel U.S. represent offers to sell the accused products in the United States because those contracts contemplated "delivery [by Autel] to [Autel U.S.] *in the U.S.*" Opening Br. 10-11 (emphasis added). That argument has no basis in the record.

The agreements between Autel and Autel U.S. contemplated that Autel would deliver the accused products to Autel U.S. at different ports *in China*, at which point title to the accused products passed to Autel U.S. *See* pp. 57-59, *supra*. Autel U.S. – not Autel – was then solely responsible for managing, arranging, and paying for the shipment of the accused products to any subsequent destination. *See* pp. 57-58, *supra*.

Orange cites (Br. 10-11) *Transocean*, but that case is distinguishable. That case involved a contract that had been negotiated abroad "by two U.S. companies for performance in the U.S." 617 F.3d at 1308. Because that contract contemplated that the "future sale that would occur" would take place in the United States, the Court held that the defendant offered to sell the product in the United States. *Id.* at 1309. Here, all sales between Autel and Autel U.S. occurred in China, pursuant to contracts that specified that Autel's performance would be in China. Autel therefore offered to sell the accused products in China, not the United States. To hold otherwise would subject Autel to liability for activities that occurred exclusively in China, which would be impermissibly extraterritorial.

### 3. Autel Did Not Import The Accused Products Into The United States

The district court also correctly concluded that there was no substantial evidence that Autel imported the accused products into the United States. Appx41-42.

1. The statute does not define the term "import." This Court interprets undefined terms in the Patent Act according to their "ordinary meaning." *Halo*, 831 F.3d at 1377. The ordinary meaning of "import" is "[t]he process or activity of bringing foreign goods into a country." *Black's Law Dictionary* (12th ed. 2024); *see Pulse Elecs., Inc. v. U.D. Elec. Corp.*, 2021 WL 981123, at *16 n.12 (S.D. Cal. Mar. 16, 2021) ("Importation has been widely defined as 'the bringing of goods into the country.'"), *aff'd*, 2022 WL 1436146 (Fed. Cir. May 6, 2022). Thus, "if someone buys a product within the U.S. from Asia containing [an infringing product], the purchaser would be importing the infringing goods, while the seller . . . would be exporting the goods." *Pulse*, 2021 WL 981123, at *16 n.12.

The evidence at trial conclusively established that Autel did not bring the accused products into the United States. Instead, Autel transferred title over the accused products to Autel U.S. in China, at which point Autel U.S. would "take over" and "handle all the paperwork for importing the products

into the United States." Appx3059. Under the distribution agreement between Autel and Autel U.S., Autel U.S. was obligated to "arrange, be responsible for and pay all shipping, freight and insurance charges from Autel's point of shipment to" Autel U.S. Appx7248. In other words, Autel was completely uninvolved with the importation of the accused products into the United States.

2. Orange contends (Br. 11) that Chen's testimony that Autel was responsible for shipping the accused products to Autel U.S. is substantial evidence that Autel imported the accused products into the United States. *See* Appx3056. But delivering the accused products to a U.S.-based company *in China* is not importing the products into the United States. Appx38 n.17. To the extent that any accused products were imported into the United States, that importation was done by Autel U.S. – an entity Orange did not sue – not Autel. *See* Appx3059, 7248.

In sum, Autel did not sell, offer to sell, or import the accused products into the United States. Autel thus is not liable for direct infringement under Section 271(a), the only claim Orange chose to bring in this case.

### B. The Accused Products Do Not Meet All The Limitations Of The Asserted Claims

The Court also should affirm the district court's judgment of non-infringement for the independent reason that the accused products do not

meet the limitation in both asserted claims that "the old tire pressure detector stores only the old identification." Autel made this argument to the district court, *see* Appx3400-3404, and although the court did not reach the issue, *see* Appx26, this Court can affirm on any "ground in the record" that "supports [the] judgment," *United States v. Jackson*, 27 F.4th 1088, 1091 (5th Cir. 2022). The Court should address this issue here, because (as the district court observed) Orange remains able to bring a lawsuit against Autel U.S. alleging that the same accused products infringe the same asserted claims. *See* Appx42. This issue thus is likely to recur.

To prove infringement, Orange had to show "that the accused device contains or performs each limitation of the asserted claims." *TI Grp.*, 375 F.3d at 1138-39. It did not make that showing here.

1. The asserted claims each describe a system to replace an old tire pressure detector with a new one. The system enables a user to copy the identifier from the old detector into the new detector. Appx128-129. The system does this using the claimed "portable setting apparatus," which is configured to send an "update identification" to the new detector, where that "update identification" is the identifier of the old detector that is being replaced. Appx128-129. Critically, the claims require that the "old tire pressure detector" that is being replaced stores "*only* the old identification."

Appx128-129 (emphasis added). Under the parties' agreed-upon construction, the term "identification" in the asserted claims means "a number or code used to identify." Appx1788.

Orange added the limitation that "the old tire pressure detector stores only the old identification" to the asserted claims during reexamination to overcome an obviousness rejection based on Nantz. Nantz teaches a TPMS that stores multiple identifications in the detectors' memory. Appx1795 (Nantz) ("In one embodiment, a bank of TPM sensor IDs is stored in the memory of TPM sensor 104"); *see* Appx2930-2931. To obtain the asserted claims, Orange expressly distinguished Nantz on the ground that in Orange's claimed system, the old tire pressure detector stores only *one* identifier: Orange told the Patent Office that the tire pressure sensor in Nantz "stores a bank of *TPM sensor IDs (in plural form)* instead of only one identification" and that "[n]owhere in Nantz teaches the TPM sensor 104 storing only one ID." Appx8930 (emphasis in original). Orange accordingly argued that Nantz "fails to teach or suggest the limitation of 'wherein the old tire pressure detector stores only the old identification.'" Appx8930. Orange thus is estopped from reading the asserted claims to cover detectors that store multiple identifiers.

2. The undisputed evidence at trial demonstrates that the tire pressure detectors in the accused products store *three* identification numbers, not one. Those identifiers are (1) an application ID, which is used for communications between the vehicle and the detector; (2) a chip ID (or UniqueID), which is used for communications between the Autel tool and the detector; and (3) the product serial number (PSN). Appx2824.

Feng Zeng, Autel's software applications supervisor, explained to the jury that each identifier is unique to each detector and is used to identify that detector. Appx2824-2826. Dr. Souri confirmed Zeng's testimony. Appx2972-2981. All three of these identifiers thus meet the parties' agreed-upon construction of "identification" ("a number or code used to identify"). Each Autel detector thus stores more than "only the old identification" and so do not practice this claim limitation.

Orange's expert, McAlexander, did not refute Zeng's or Dr. Souri's testimony. That is, he did not dispute that each Autel tire pressure detector stores three unique identification numbers. Instead, he testified that he "considered" only one identifier in the accused Autel sensors to be the "identification" for his infringement analysis. Appx2675. In other words, he simply ignored the other identifiers that did not fit his narrative.

3. In the district court, Orange argued that the claim term "identification" must be limited to "the type of identification that 'is to be written' to a new tire pressure detector." Appx3503. It argued that the chip ID and PSN did not qualify as "identification[s]" because there was no evidence that those numbers could be written to a new detector. Appx3503-3504.

The parties' agreed-upon construction of "identification" does not limit that term to just the identifier written to the new tire pressure detector. Orange agreed that an "identification" for purposes of the asserted claims is simply "a number or code used to identify." Appx1788. Orange is bound by that construction and cannot now rely on a different construction of the term "identification." *See Finjan LLC v. Sonicwall, Inc.*, 84 F.4th 963, 971 (Fed. Cir. 2023) (courts "do not permit parties on appeal to raise claim construction arguments challenging a stipulated construction"); *Traxcell Techs., LLC v. Sprint Commc'ns Co.*, 15 F.4th 1121, 1129 (Fed. Cir. 2021) (similar).

Orange's argument also is inconsistent with the reason it included this limitation in the first place. As explained, Orange added the limitation that the old detector stores "only the old identification" to distinguish its claimed system from that described in Nantz, in which the old detector can store multiple identifiers. Appx8930. But if Orange meant that the detector

in its system can store multiple identifiers so long as only one of those identifiers is written to a replacement detector, that would not distinguish Nantz because Nantz teaches a system in which only one of the identifiers in the old detector is written to a replacement detector. *See* Appx1795 ("[W]here TPM Sensor 104 is damaged . . . immobilizer 102 may read *the ID* of the damaged TPM sensor and transmit an LF signal containing *the ID* of the damaged sensor to a replacement TPM sensor." (emphases added)). Orange thus could not have meant that "identification" means only the identifier that is cloned to the new detector, because that would not have distinguished its claimed system from that taught in Nantz.

The bottom line is that Orange specifically added a one-identifier limitation to avoid an obviousness rejection. It is undisputed that Autel's sensors contain three unique identifiers. Orange cannot now argue that a multiple-identifier detector nonetheless infringes its claims. *Cf. Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017) (claims should not be "construed one way in order to obtain their allowance and in a different way against accused infringers" (citation omitted)). For this reason also, if the Court does not hold that the claims are invalid, the Court should affirm the district court's judgment of non-infringement.

## CONCLUSION

The Court should reverse the district court's judgment that the asserted claims are not invalid and should affirm the district court's judgment of non-infringement.

Dated: October 9, 2024

Respectfully submitted,

/s/ *Nicole A. Saharsky*

Nicole A. Saharsky
Gary M. Hnath
James A. Fussell, III
Bryan C. Nese
Minh Nguyen-Dang
Clark S. Bakewell
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3052
nsaharsky@mayerbrown.com

Hao Tan
Shen Wang
ARCH & LAKE LLP
203 N. LaSalle Street, Suite 2100
Chicago, IL 60601
(312) 558-1369

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i) complies with the type-volume limitation of Circuit Rule 32.1(a)(4)(A) because it contains 16,477 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2016 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: October 9, 2024

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on October 9, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky