**No. 2024-1876; 2024-1885**

# United States Court of Appeals for the Federal Circuit

**ORANGE ELECTRONIC CO. LTD.**
*Plaintiff-Appellant*

v.

**AUTEL INTELLIGENT TECHNOLOGY CORP., LTD.**
*Defendant-Cross-Appellant*

Appeal from the United States District Court for the Eastern District of Texas, Case No. 2:21-cv-00240-JRG

**RESPONSE AND REPLY BRIEF OF PLAINTIFF-APPELLANT**

John F. Rabena
William H. Mandir
SUGHRUE MION, PLLC
2000 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 293-7060
Fax: (202) 293-7860
*Attorneys for Appellant Orange*

November 18, 2024

# Table of Contents

CONTENTS

**STATEMENT OF THE ISSUES** ........................................................................ 1

**STATEMENT OF THE CASE** ........................................................................ 2

**SUMMARY OF THE ARGUMENT** ........................................................................ 4

**ARGUMENT** ........................................................................ 4

A. Autel Disregards Substantial Evidence of Sales Within the United States, Instead Improperly Focusing on the Impact of Shipping "f.o.b. China" ................ 4

B. Substantial Evidence Supports the Verdict that the Old Sensors Store Only The Old Identification of the Identification Rewritable Tire Pressure Detector .... 7

C. Substantial Evidence Supports The Verdict That Autel Failed to Prove That Claims 26 and 27 Are Invalid as Obvious ........................................ 14

D. Autel Failed to Prove That Claims 26 and 27 Are Directed to Ineligible Subject Matter ........................................ 19

1. The Claims are Not Directed to An Abstract Idea ........................................ 19

2. Substantial Evidence Supports the Jury Verdict that the Claims are not Conventional ........................................ 23

**CONCLUSION** ........................................................................ 29

## Table of Authorities

### Cases

*Abbott Laboratories v. Sandoz, Inc*., 544 F. 3d 1341, 1348 (Fed. Cir. 2008) .........17

*Alice Corp. Ptc. Ltd. v. CLS Bank Inern.,* 573 US 208, 134 S. Ct. 2347, 2354 (2014) .......................................................................................... 21, 28

*Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 n.15 (Fed. Cir. 2016) ......17

*BASCOM Global Internet v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) ...............................................................................................................25

*Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) ..............................25

*DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014)...26

*Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986) .........................................................................17

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337-38 (Fed. Cir. 2016)..... 20, 21

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) ...............................................................................26

*McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001) ............17

*McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) .......................................................................................................20

*Polaris Industries, Inc. v. Arctic Cat, Inc.*, 882 F. 3d 1056, 1069 (Fed. Cir. 2018)17

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013)............................................................................17

*SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) ...............26

### Statutes

35 U.S.C. § 271 ............................................................................ 4, 6, 11

## STATEMENT OF RELATED CASES

There are no cases that could affect or be affected by this appeal.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding that the jury's verdict of infringement was not supported by substantial evidence, namely, in finding that there was no substantial evidence that Defendant's sales, offers for sale, and/or importations were in the United States. (Orange's original issue on appeal).

2. Whether there was substantial evidence to support the jury's verdict that Autel failed to prove by clear and convincing evidence that the claims of the asserted patent, both individually and as an ordered combination, involved only technology that was well-understood, routine, and conventional at the time of the alleged invention.

3. Whether there was substantial evidence to support the jury's verdict that Autel failed to prove by clear and convincing evidence that any of the asserted claims were invalid as obvious.

4. Whether there was substantial evidence to support the jury's verdict that Autel's detectors do not store any "update identification" that can be rewritten into another detector other than the "old identification."

## STATEMENT OF THE CASE

Orange disagrees with Autel ITC's Statement of the Case for at least the following reasons:

On Page 8 of Autel's Brief, Autel includes quotes relating to the term "portable" that are not citations to any evidence or definition in the record. Autel did not seek to have the term "portable" construed, and the jury was properly instructed by the district court to apply its plain and ordinary meaning. Appx3252.

Orange disagrees with Autel's statements (Autel Br. pp. 11, 15, 17) that it does not sell the accused products in the United States, for the reasons set forth in Orange's Statement of the Case in Appellant's Principal Brief.

Orange disagrees with Autel's representations (Autel Br. pp. 13, 16) that the facts relating to its "identification" argument are "undisputed," and that its detectors store three of the claimed "identifications." Rather, substantial evidence was presented at trial that only the old "identification of the identification rewritable tire pressure detector" is stored in Autel's products. The additional information that Autel's detectors store are not the claimed "identification of the identification rewritable tire pressure detector" which is an "identification to be written into the rewriteable memory" of a new detector as an "update

identification." Autel's detectors store only the old identification exactly as claimed.

Orange disagrees with Autel's paragraph (Autel Br. pp. 13-14) that begins "[t]he undisputed evidence showed that the asserted claims are invalid because they claim ineligible subject matter" for the reasons set forth herein. Orange disagrees with Autel's paragraph (Autel Br. pp. 14-15) that begins "[t]he undisputed evidence further showed that the asserted claims are obvious" for the reasons set forth herein. Orange disagrees with Autel's statement (Autel Br. p. 17) that Orange offered no evidence other than Mr. McAlexander's testimony regarding invalidity. Certainly the asserted prior art references, the '064 patent[1], Dr. Souri's admissions, Inventor Yu's testimony, and Orange's awards of achievement, together with Mr. McAlexander's expert testimony, provide substantial evidentiary support of the jury's verdict that Autel failed to prove invalidity or ineligible subject matter.

[1] Asserted U.S. Patent 8,031,064 C3.

## SUMMARY OF THE ARGUMENT

All of the issues on appeal, whether raised by Appellant Orange or Cross-Appellant Autel ITC, were decided by the jury in Orange's favor. These issues therefore only require substantial evidence for this Court to uphold Orange's positions and the Verdict. Autel's Opening Brief misses this point and ignores that standard, instead focusing on evidence that allegedly supports only Autel's positions.

## ARGUMENT

### A. Autel Disregards Substantial Evidence of Sales Within the United States, Instead Improperly Focusing on the Impact of Shipping "f.o.b. China"

According to Autel, "[a]ll of the evidence bearing on [the sales] issue was introduced at trial by Autel and is undisputed. Orange did not introduce any evidence that contradicted Autel's evidence." Autel Br. At 53-54, citing Appx36. Autel's characterization of the evidence is both incorrect and misleading. First, Orange introduced evidence at trial in the form of elicited admissions from Autel's witnesses; these admissions support the Jury's Verdict that Autel ITC offered for sale, sold and imported infringing products into the United States, including admissions that:

- Autel ITC performs the actual shipping of the products, and those ***shipments*** are directly from Autel ITC in China, ***to the New York Headquarters of Autel U.S.*** Appx3054-3056; Appx3059;
- Autel ITC knows "where ***our customer*** is and located and that (sic) is ***going to the U.S.***" Appx3059 (emphasis added);
- "the products are ***sold to Autel U.S. That is in the United States***." Appx3052 (emphasis added);
- "the ***destination*** of the shipment of these products ***is USA***." Appx3054 (emphasis added);
- Autel ITC renegotiated the price and quantities of Sale Contracts like Appx9054 with Autel U.S. on an ongoing, regular basis. Appx3057-3058.

Second, just because Autel ITC was the party who introduced at trial its own Distribution Agreement (Appx7241-7267), and its representative Sales Contracts and Invoices (Appx9051-9068), does not mean that they support Autel ITC's position. In fact, these documents support the jury's Verdict of direct infringement in the U.S. Autel continues to ignore that its very own "Sales Contracts" show that the "Port of Destination" was the "United States," and the "***Buyer***" was "***Autel U.S***." in *"**New York**."* Appx9051-9068 (emphasis added). Autel's "Sales Contracts," which identified Autel U.S. in New York as the "***Buyer***" themselves

represent substantial evidence to support the Jury's Verdict of infringement. Rather than addressing such substantial evidence head-on, Autel ITC instead continues to focus on facts it believes support its position that f.o.b. deliveries avoid infringement in the United States. Autel Br. 66.

For example, the jury had evidence that Autel ITC physically shipped the accused products from Autel ITC in China ***directly*** to Autel U.S. in New York. (Appx3056, Appx9054, Appx9061), as Orange pointed out in its Appellant's Brief. In response, Autel ITC incorrectly alleges that this "argument has no support in the record," never addressing the cited evidence, and instead rehashing its f.o.b. loophole argument that despite the facts of direct shipment to Autel U.S. in New York, Autel U.S. nevertheless "took delivery" of these products in China. Autel Br. 66. To be sure, the Autel ITC witness's only explanation for saying that Autel ITC does not sell products in the U.S. despite direct shipments of the infringing products to Autel US, is that the title transfers while still in China – a rehashed f.o.b. argument. Appx3056.

The entirety of the trial record demonstrates that the jury had substantial evidence to support its verdict of direct infringement in the U.S. Autel's argument that "title changed" in China because of the f.o.b. shipments necessarily avoids direct infringement, is contrary to this Court's precedent and if allowed, would

open a massive loophole for foreign manufacturers to avoid liability for sales made into the United States.

### B. Substantial Evidence Supports the Verdict that the Old Sensors Store Only The Old Identification of the Identification Rewritable Tire Pressure Detector

The jury heard Autel's argument that its sensors store a "chip ID" and a "Part Serial Number (PSN)" and therefore when "old" Autel sensors are being replaced, they avoid the claim requirement that the "old tire pressure detector stores only the old identification;" the jury properly discarded this contrived argument.

First, Autel's expert Dr. Souri agreed that this claim language did not mean one can avoid infringement simply by storing *any* other information in a detector. That would render the claim nonsensical because then a detector would not even be able to store tire pressure information, the very reason for having a detector in the first place.

> Q. … Now, there's a lot of other information on this screen in the -- from the tool, like the frequency, the voltage, and we all agree that the detector, the old detector, stores pressure information. Right?
>
> A. Yes.
>
> Q. So you're not contending that by storing that type of information, the product, the Autel products, avoid the claims. Right?
>
> A. Oh, no, no. Specific to identification.
>
> Q. It has to be an identification –

A. Correct.

Q. -- to avoid the claim. Okay.

Appx3014. Rather, Dr. Souri explained to the jury that this limitation was added to the claims to distinguish over the Nantz prior art, in which an “old” detector/sensor stored a bank of *new* IDs that the operator would select from when programming a TPMS system. Appx2970; Appx3014-3015; Appx8930.

> Q. (BY MR. RABENA) The purpose of the bank of sensor IDs in the Nantz reference being stored in the sensor is that so the installer can select one of those sensor IDs, isn't it?
>
> A. I don't agree that that's the sole purpose of it, no.
>
> Q. It's one purpose.
>
> A. It can be, yes.

Appx3016; see also Appx3743 (Nantz) (“In one embodiment, a bank of TPM sensor IDs is stored in the memory of TPM sensor 104…”); Appx3278-3280. Dr. Souri further testified “that there's got to be one ID that is stored in the old sensor, and there can't be multiple IDs. There can't be in plural form other IDs. ***It can only be the one ID***.” Appx2970 (emphasis added).

But the claim phrase in question does not say “only one” identification as Dr. Souri testified. Instead it requires storage of “only the ***old*** identification.” Appx7482 (emphasis added). So assuming *arguendo* that the chip ID and PSN are deemed to be claimed “identifications” as Autel argues, they would be “old

identifications" because they are used in the operation of the original detector. Appx2824-2827. That is, the stored chip ID and PSN are not new "identifications" that are being saved to replace an "old identification" in the future like the unused or "new" identifications in the Nantz prior art.

Moreover, assuming that Dr. Souri were correct that the claim recited "stores only one identification," his analysis still falls short. This is because he left out that the claims also recite that this stored old ID must be useable as the "update identification," i.e, the type that is "to be written…" into another detector (Appx7482), and neither the "chip ID" nor the "PSN" are ever used as "update identifications" or written into another detector. Thus in the context of the asserted claims, the chip ID and the PSN are simply other data like pressure, temperature and voltage that do not avoid infringement, as Dr. Souri agreed. Appx3014.

To this end, the jury heard no evidence that Autel's "chip ID" and "PSN" were *new* detector identifications like in Nantz, that were "to be written" into another detector. In addition to the agreed definition of "identification"[2] that Autel likes to point to in a vacuum, Orange's expert Mr. McAlexander presented the entire claim language to the jury to provide context and limit "identification" to the type of identification that is "to be written" to a new tire pressure detector. For

[2] The parties agree that this is not a claim construction dispute, as the definition was stipulated. Instead the question is whether there was substantial evidence in the record to support the jury verdict that this element was met.

example, claim 26 requires[3] that the "identification" in the claim is "the ***identification of the*** identification rewritable tire ***pressure detector***", that "the external signal comprises an external ***identification to be written into the rewriteable memory***", and that the "portable setting apparatus" must "obtain an update identification ***to be written into a new identification rewriteable tire pressure detector*** … by … retrieving an old identification of the old tire pressure detector .. and ***using the old identification as the update identification***…" Appx7482 (emphasis added).

The jury had substantial evidence that Autel's products store only the old identification of the detector that is "to be written" into another detector. That identification is what Autel's engineers and documents refer to as a "sensor ID" or "application ID." Appx2824. It is undisputed that Autel's sensors store only one old sensor/application ID and do not store any new sensor/application IDs (such as in Nantz). Appx2838 (Zeng: "A. Yes. So ***one sensor application ID*** at a time.") (emphasis added); Appx2843 (Zeng: "A. …because there's ***only one application ID***, that's why they ***only store one application ID***.") (emphasis added); Appx2677 ("Q. And ***how many old identifications*** is it showing in this figure? A. There's ***only one*** shown for that tire.").

---

[3] Claim 27 contains similar language. Appx7482.

And *only* Autel's "sensor/application ID" is the type that is "the ***identification of the*** identification rewritable tire pressure ***detector***" that is "… ***to be written*** into a new identification rewriteable tire pressure detector" as the claims require. Appx7482.

> Q. … When you're using the Copy by Activation feature, it's the sensor ID that is the ID that can be rewritten to a new sensor.
>
> A. Sensor IDs are stored in sensor's flash, so it can be rewritten, yes.
>
> Q. Flash, is that rewritable memory?
>
> A. Yes.

Appx2836-2837; see also Appx2824-2825; Appx2837 ("Q. The original sensor ID is copied into a new sensor. Right? A. The original sensor's application ID and the app location program will be written into a new sensor."); Appx2681 ("… the programming operation is then downloading that old identification number to the new rewriteable sensor."). Autel presented no evidence to the jury that Autel's "chip ID" or "Part Serial Number" were new sensor IDs that could be rewritten to a new tire pressure detector. In other words, the "chip ID" and "PSN" are not additional new "identifications" that avoid claims 26 and 27 because they are not "the identification of the identification rewritable tire pressure detector" that is used as the "update identification … to be written into a new identification rewriteable tire pressure detector," as claimed. The chip ID and PSN are simply

other data like the pressure, temperature, and voltage information that the parties agree do not avoid infringement. Appx3014.

Finally, Autel's argument on this point applies only to the scenario when old *Autel* detectors are being replaced by new Autel detectors. It does not apply to the scenario when other brand detectors are being replaced by Autel detectors using an Autel programming tool. The jury heard evidence that when an old tire pressure detector that is being replaced is an original equipment (e.g., OEM) detector as opposed to an Autel brand detector, the OEM detectors also store only an old identification as claimed. Appx2603 ("So we've looked at several different types of OE sensors. Generally speaking, each sensor has only one unique ID."). Both Mr. McAlexander and Autel's engineer witness explained that Autel's literature refers to the "original sensor ID" as the sensor ID of either the old OEM sensor or old Autel sensor that is being replaced. Appx7451; Appx2655-2656 ("Q. All right. What is your understanding of the underlying phrase, original sensor ID? A. This would be the OEM sensor, the original equipment sensor. Q. Okay. That's the one that's being replaced? A. Yes, that's correct."); Appx2676 ("…the old original like the OEM sensor that was part of the original vehicle. And so now you're reading that information, identifying what that old original sensor identification is, and then being able to program that in and update it into the setting apparatus.").

Notably the jury heard that Autel's user manual shows only one old ID for the original sensor being replaced, and Autel's witness explained that the reference to "original sensor" in the manual refers to either an old OEM sensor or an old Autel sensor being replaced. As shown in Autel's manual below, the jury heard that only one "Original sensor ID" is displayed in Autel's Copy by Activation programming mode.




Select Copy by Activation from programming list. Activate or Trigger sensor to be copied.




Trigger successful.

Original sensor ID displays on screen.

Press **Y** to program the original sensor ID to MX-Sensor.

Appx7153-7240, e.g., Appx7202 (yellow highlighting added); Appx2834-2835 ("…it can be either an OEM sensor or an original sensor which is an Autel sensor.").

Thus, the Jury's Verdict of infringement is also supported by substantial evidence that when an Autel programming tool is used to replace an old OEM detector with a new Autel detector, that is also an infringing use. Appx2603; Appx2655-2656; Appx2676; Appx2834-2835; Appx7153-7240, e.g., Appx7202.

### C. Substantial Evidence Supports The Verdict That Autel Failed to Prove That Claims 26 and 27 Are Invalid as Obvious

Autel had a burden to prove obviousness by clear and convincing evidence, and the jury properly found that Autel did not meet that burden. The lower court was correct in finding that the jury heard substantial evidence that Autel's proposed prior art was not obvious to combine and even if combined, still failed to teach or suggest all of the elements of claims 26 and 27. Appx55. For example, as shown in the annotated version of Nihei Fig. 5 below, when the Nihei setting device 60 is used to install new detectors, it must transmit the new detector ID and position information to the receiver communication portion 18a and receiver body portion 20. Both receiver portions 18a and 20 are part of the truck vehicle 14. See also Appx3748 (Fig 1).




The description in Nihei confirms this requirement. Appx3756, Par. 72 ("Further, this ID and the installation position information … are transmitted to the receiver body portion 20 [of the truck vehicle 14], to thereby cause the receiver body portion 20 to correlate the ID with the installation position information, and to set and register this result"). The jury thus heard that Autel's combination of references, would still require the operator to access the vehicle's computer to program the new ID into the vehicle's computer. Appx3006, Appx3151-3154; Appx3748 (Fig 1); Appx3749 (Fig. 4). That is exactly the problem that the '064 patent avoids and overcomes. Appx2590-2591; Appx7471; see also Appx3156-3157. As Mr. McAlexander explained,

> .. the industry was moving in a direction to make it better in terms of the way the ***controller*** interfaced with the tires themselves, the identification of

> the tires, but it was all ***controller-driven***. And what I have shown you today, even in a review of the Nihei and Nantz references that have been purported to produce the invention of the '064 Patent, I have expressly shown where they don't. They taught also everything being a part of the car and ***not something that was a separate unit*** that was portable for doing the setting and the identification and ***avoiding having to do it with a controller***.

Appx3156 (emphasis added). This is one example of a reason one of skill would not combine these teachings and the jury was entitled to rely on it as a reason to find that Autel did not meet its clear and convincing burden.

The jury also had evidence that the Nantz patent (Appx3739) taught the use of a two way LF channel which required the TPM sensor to have an LF transmitter. Appx3740 (Fig. 1). This is not the direction of the claimed invention which expressly requires a one-way LF channel for programming sensors, and a one-way RF channel for sensor transmission. Dr. Souri admitted that no modern TPM sensors have an LF transmitter as in this prior art approach. Appx3011 ("Q. Are you aware of any TPMS sensors in the market that we've been talking about that have low frequency transmitters? A. That's generally not the way it's done."). Yet Autel's proposed combination of references required Dr. Souri to pick and choose elements from certain references and discard other elements, in order to appear more like the claimed invention. It is hornbook law that "in addressing the question of obviousness [one] must not pick and choose isolated elements from the prior art and combine them so as to yield the invention in question if such a combination would not have been obvious at the time of the invention." *Abbott*

*Laboratories v. Sandoz, Inc*., 544 F. 3d 1341, 1348 (Fed. Cir. 2008), quoting *Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986). This Court has noted that "the prejudice of hindsight bias" overlooks that the "genius of invention is often a combination of known elements which in hindsight seems preordained." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013) (quoting *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001)). A reference's disclosures "regarding preferences are relevant to a finding regarding whether a skilled artisan would be motivated to combine that reference with another reference." *Polaris Industries, Inc. v. Arctic Cat, Inc.*, 882 F. 3d 1056, 1069 (Fed. Cir. 2018), citing *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1051 n.15 (Fed. Cir. 2016) (*en banc*) (noting that, even if a reference "does not teach away, its statements regarding users preferring other forms of switches are relevant to a finding regarding whether a skilled artisan would be motivated to combine the slider toggle in…" that reference with the invention of a second reference).

The jury also heard evidence that Nantz taught storing multiple new potential sensor identifications in the detectors themselves, and simply using the setting tool to select one of those new identifications and update the vehicle's controller to let it know what the new identification was for that wheel.

> Q. (BY MR. RABENA) The purpose of the bank of sensor IDs in the Nantz reference being stored in the sensor is that so the installer can select one of those sensor IDs, isn't it?
>
> A. I don't agree that that's the sole purpose of it, no.
>
> Q. It's one purpose.
>
> A. It can be, yes.

Appx3016; see also Appx3743 (Nantz) ("In one embodiment, a bank of TPM sensor IDs is stored in the memory of TPM sensor 104…"). And the jury heard that during the third reexamination, the claim 26 and 27 requirement that the "old tire pressure detector stores only the old identification," was added to distinguish from Nantz's approach of storing many new sensor identifications. Appx3014-3016; Appx8930.

The jury also heard testimony from Mr. McAlexander, which was supported by the Nihei reference itself, that one of skill would not consider the Nihei setting device 60 together with the PC 62, to be the claimed "setting apparatus." Appx3154-3156. The Nihei reference has a structure that it calls a "setting device 60." But Autel ignores what Nihei calls the "setting device 60" and instead alleges that the Nihei "setting device 60" together with the attached PC 62 constitute the "setting apparatus" of the '064 claims. But what Nihei calls a "setting device 60" does not have a manual input capability as required by claims 26 and 27 – that is why Autel tries to rewrite Nihei in order to add-in the PC's keyboard. As Mr.

McAlexander explained, anchoring the setting device 60 to the PC 62 would render the setting device 60 not portable as claimed. Appx3154-3156. Moreover, the jury heard Mr. McAlexander's explanation that the Nantz "immobilizer," which programs Nantz's sensors, is also not portable as it is physically part of the vehicle. Appx3154-3156; Appx3741.

The jury also heard evidence of secondary considerations of non-obviousness from Mr. Yu and Mr. McAlexander, including praise by others via the awards that Orange received for the patented technology. Appx2604-2606; Appx3156; Appx9698-9699.

In short, the district court properly found that substantial evidence was presented at trial to support the verdict that Autel failed to meet its clear and convincing burden on obviousness.

### D. Autel Failed to Prove That Claims 26 and 27 Are Directed to Ineligible Subject Matter

Although the district court correctly upheld the jury verdict that the asserted claims are not conventional and therefore are patent eligible, the district court did err in finding that the claims are directed to an abstract idea in the first place.

1. The Claims are Not Directed to An Abstract Idea

The district court oversimplified Orange's claims and ignored the specific requirements of the claims by asserting that the claims are directed to an abstract

idea of "updating identification information in the context of a rewritable tire pressure detector." Appx52. See *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("[C]ourts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the[ir] specific requirements."), and *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337-38 (Fed. Cir. 2016) ("In finding that the claims were directed simply to 'the concept of organizing information using tabular formats,' … the district court oversimplified the self-referential component of the claims and downplayed the invention's benefits.").

Even a cursory review of the claims reveals they recite an unconventional ordered arrangement of mechanical and electrical components that solve a technical problem with a concrete technical solution. Rather than merely automating the conventional way of "updating identification information," the claims recite a very specific and nonconventional way of configuring a new tire pressure detector that replaces an old tire pressure detector and bypasses the need to reprogram the vehicle's computer.

Like the error the district court made in *Enfish*, the lower court here by describing "the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337, citing *Alice Corp. Ptc. Ltd. v. CLS Bank Inern.*,

573 US 208, 134 S. Ct. 2347, 2354 (2014) (noting that "we tread carefully in construing this exclusionary principle [of laws of nature, natural phenomena, and abstract ideas] lest it swallow all of patent law"). In *Enfish* the "district court concluded that the claims were directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' or, more simply, 'the concept of organizing information using tabular formats.'" *Id*. This Court found the district court's conclusion to be an overgeneralization of the claimed invention since the claims recited a specific way of storing tabular data, in a self-referential table, and the specification described how this improves upon the prior art information search and retrieval systems. *Id*.

The lower court here has made the same mistake as the lower court did in *Enfish*. The '064 claims are directed to improving conventional tire pressure detection systems, reciting specific limitations that together provide an unconventional technical solution to the technical problems attendant such systems. For example, claim 26 requires a portable setting apparatus that can "obtain an update identification to be written into a new identification rewriteable tire pressure detector … by (1) receiving the RF signal from an old tire pressure detector by the receiving module, retrieving an old identification of the old tire pressure detector from the RF signal, and using the old identification as the update identification…". Claim 26 continues, requiring the setting apparatus to wirelessly,

over an LF channel, send the copied identification to a new rewriteable tire pressure detector so that the new detector stores the copied identification as its own identification. Claim 26 does not simply recite an automated approach to a prior process that used to be handled manually.

The ‘064 specification explains that this is a different arrangement of hardware components that interact differently than prior approaches to use different data and thereby “trick” the vehicle into thinking the old detectors are still installed. Appx7471 (“However, the setting apparatus (90) is only fitted with some specific tire pressure detectors (74) that have to be manufactured by the same company. Flexibility and convenience of changing the tire pressure detector (74) are not good since users have to look for specific service centers that have the setting apparatus (90) to change the tire pressure detectors (74)”); Appx7472 (“As described above, a car user may easily replace a failed tire pressure detector with one identification rewriteable tire pressure detector (10) by few steps as described above. No more complicate[d] sequence is needed to reset or introduce a new identification of a new tire pressure detector to a monitoring system installed inside the car.”); Appx2590-2591 (…So we are trying to copy the old sensor ID to trick the car computer into thinking that it is still receiving data from the old sensor and so that we can allow the TPMS system to continue to function.”).

Like *Enfish*, the lower court erred in finding that this was a broad abstract idea of simply "updating identification information," when in fact the claims recite a specific solution to a real-life technical problem in the industry.

2. Substantial Evidence Supports the Jury Verdict that the Claims are not Conventional

Nevertheless, the jury properly found that pursuant to *Alice* step two, the claims are not well-understood, routine or conventional, and the district court properly upheld the jury's finding. Appx50-53. Autel's patent ineligibility case was based on the three-way combination of Nihei, Nantz, and Lemense. As explained above regarding nonobviousness, these references had so many problems and differences from the claimed invention that the jury had numerous reasons to conclude that the claimed inventions were not "well-understood, routine, and conventional" before Mr. Yu's invention.

For example, both Dr. Souri and Mr. McAlexander testified that Nihei sends the new identification to the vehicle's controller 20 so that the vehicle's controller knows what the identification of the new sensor is. e.g., Appx3002-3003; Appx3006; Appx3151 ("…it teaches to reprogram and update the vehicle's controller, and that is the opposite direction from what the '064 Patent was focused on, which is being able to update the sensors without having to update the controller"); Appx3152-3154; Appx3748 (Fig. 1); Appx3749-50 (Figs. 4-5);

Appx3756 (Par. 72); Appx2590-2591; Appx7471-7472; see also Appx3154-3157; Appx3741. Nantz adds a teaching of storing multiple new IDs so the user can pick one for use in operation, which in addition to being contrary to express claim language, would also require telling the vehicle controller what that ID was. Appx3016-3017; see also Appx3743 ("In one embodiment, a bank of TPM sensor IDs is stored in the memory of TPM sensor 104…"). As Autel's own expert Dr. Souri testified, the claims were amended during prosecution to specifically distinguish from Nantz's bank of stored sensor IDs. Appx3016; see also Appx3743. Nantz also teaches to use bi-directional LF communications (Appx3740 (Fig. 1); Appx3011), which is also contrary to express claim requirements. Appx7482.

The reliance on the vehicle's controller of Autel's asserted prior art is the exact problem that the '064 patent fixes. Autel's additional reliance on a few words out of the Lemense reference does not fix or even address the problems in the Nihei and Nantz combination (Appx3156-3158), and the vague mention from the single reference Lemense, of using an old id, does not make the entire ordered combination conventional. "Whether a particular technology is well-understood, routine, and conventional ***goes beyond what was simply known in the prior art***. The mere fact that something is ***disclosed*** in a piece of prior art, for example, ***does***

***not mean it was well-understood, routine, and conventional***." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (emphasis added).

The jury was properly instructed as follows:

> If the evidence shows by clear and convincing evidence that the elements of the asserted claims, when taken individually or **when taken as an ordered combination**, involve only technology which a person of ordinary skill in the art would have considered **well-understood, routine, and conventional**, then this element of patent ineligibility has been established.

Appx3266 (emphasis added). Based on that instruction and the evidence presented, the jury properly answered "No" to Verdict Question No. 3 "Did Autel, the Defendant, prove by clear and convincing evidence that the claim elements of the 064 Patent, both individually and as an ordered combination, involve only technology that was well-understood, routine, and conventional at the time of the alleged invention?" Appx2385.

"The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," and must be proven by clear and convincing evidence. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *BASCOM Global Internet v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) ("The inventive concept inquiry ***requires more than*** recognizing that each claim element, by itself, was ***known in the art***. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces.").

For example, when "the claimed technology 'overrides the routine and conventional sequence of events'" to provide a technological benefit, it is eligible at *Alice* step two. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1304 (Fed. Cir. 2019) (quoting *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014)). Consideration of the unique and inventive results of the "ordered combination" of elements—even individually known elements—is essential, since "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418–19, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).

The district court recognized that the jury's answer to Verdict Question No. 3 is supported by substantial evidence. Appx50. For example, the district court pointed out that Mr. McAlexander provided two reasons for why the asserted claims do not recite well-understood, routine, and conventional inventions. Appx50. He testified that the bulk of the industry, as well as the prior art that Autel relied upon, was moving in a different direction at the time of the invention, namely by trying to improve ways to program the *vehicle's* computer. Appx3156-3157, and Appx3157-3158.

First, he explained that the claimed "invention[s were] contrary to the accepted wisdom of the prior art at that time." Appx3156-3157. Specifically, the

claimed inventions avoided having to interact with the vehicle's controller while the rest of the industry "was all controller-driven." Appx3156-3157. He also reasoned that the asserted claims "created a unique way of combining these elements." Appx3157. Indeed, "the specific structural and functional arrangements" recited by the limitations of the asserted claims "set[] forth [a] technical improvement over the existing systems that were prevalent at that time." Appx3157. Second, he explained that the asserted claims:

> … clearly include the technical solution to the problem that was identified in the specification, and that's being able to adjust and change the identity of . . . each wheel without having to go back and make an adjustment to the vehicle's controller. And so it provided a system for transferring the unique identification, exclusively with one pressure detector to another, that was rewritable, and the specification clearly expresses how this is achieved.

Appx3158.

This technical solution is made possible by the ordered combination of claim elements including the requirement that the claimed setting apparatus "obtain an update identification to be written into a new identification rewriteable tire pressure detector … by (1) receiving the RF signal from an old tire pressure detector by the receiving module, retrieving an old identification of the old tire pressure detector from the RF signal, and using the old identification as the update identification…" and "generate the external signal comprising the update identification as the external identification, and send the external signal to the new identification rewriteable tire pressure detector such that the new identification

rewriteable tire pressure detector records the update identification in the rewritable memory unit or overwrites the preset identification in the rewritable memory unit by the update identification, wherein the external identification is from the old tire pressure detector, and the external signal is a low frequency (LF) signal." Appx7482.

Mr. McAlexander explained that this technical solution was distinct from the district court's defined abstract idea. Appx52, quoting Appx3158; *see also* Appx2590-2591 ("…skip the need to reset the car computer or the OBD tools because the car computer is still thinking that it's using the old sensor ID. So we are trying to copy the old sensor ID to trick the car computer into thinking that it is still receiving data from the old sensor and so we can allow the TPMS system to continue to function."). The district court relied on the substantial evidence in the trial record that demonstrated the technical solution was unconventional and distinct from the defined abstract idea, and that further supported the verdict that the claims define significantly more. Appx52, citing *Alice Corp.*, 573 U.S. 208, 218 (2014), (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 73 (2012); see also *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-1301 (Fed. Cir. 2016) (finding claims eligible that recited conventional elements working in an unconventional fashion to solve a particular technological problem).

Mr. Yu's elegant solution was certainly not well-understood, routine, and conventional, when the bulk of the industry and prior art that Autel relied on was moving in the opposite direction at that time. Appx3158. In sum, although Autel tried to convince the jury that individual claim elements may have been well-understood, routine and conventional, Orange presented substantial evidence that the asserted claims were not well-understood, routine and conventional **when taken as an ordered combination**.

## CONCLUSION

For the reasons above, the Court should:

1) find that substantial evidence supported the jury verdict that Autel ITC sold, offered to sell, and/or imported infringing products in the United States and therefore reverse the district court's Final Judgment of no infringement and associated Order;
2) find that substantial evidence supported the Verdict that Autel ITC infringed claims 26 and 27 of the '064 patent; and
3) uphold the Verdict that Autel did not prove the asserted claims to be invalid or ineligible by clear and convincing evidence.

Respectfully submitted,

Dated: November 18, 2024

*/s/ John F. Rabena*
John F. Rabena
William H. Mandir
SUGHRUE MION, PLLC

2000 Pennsylvania Avenue NW
Washington, DC 20006
Tel: (202) 293-7060
Fax: (202) 293-7860

*Attorneys for Appellant*
*Orange Electronic Co. Ltd.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2024, a true and correct copy of the foregoing was timely filed with the Clerk of the Court using the appellate CM/ECF system and thereby served on all parties.

*/s/ John F. Rabena*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) and the Rules of this Court, because it contains 5,989 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ John F. Rabena*